Lenore L. Albert, Esq.   SBN 210876
LAW OFFICES OF LENORE ALBERT
7755 Center Avenue, Suite #1100
Huntington Beach, CA 92647
Telephone (714) 372-2264
Facsimile (419) 831-3376
Email: lenorealbert@msn.com
Attorney for Plaintiff, HELEN GALOPE

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| HELEN GALOPE, an individual,<br><br>               Plaintiffs,<br><br>vs.<br><br>DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE, et al,<br>               Defendants. | CASE NO. SACV 12 00323-CJC (RNBx)<br><br>Assigned to the Hon: Cormac J. Carney<br><br>**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**<br>DATE: July 16, 2012<br>TIME: 1:30PM<br>DEPT: 9B |

**TO THE COURT, ALL PARTIES AND THEIR COUNSEL OF RECORD:**

TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

NOW COMES PLAINTIFF TERI ROYAL , and hereby request that this Honorable Court take Judicial Notice of the following documents and statutes in this case to be heard at the above date and time or as soon thereafter as the matter can be heard, in the above-captioned Court. Moving party requests that this Court take Judicial Notice of such documents, files and records pursuant to California Evidence Code §§ 451, 452, and 453.

1.      Defendant's Notice of Motion and Motion to Dismiss Complaint filed on March 26, 2012 as Document No. 16 in this Case (Galope v DBNTC Case No. 12-cv-00323) page 8 "What plaintiff fails to address in the Complaint is that the original Note and Deed of Trust control all other

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

*GALOPE v DEUTSCHE BANK NATIONAL TRUST COMPANY*        *SACV12-323-CJC (RNBx)*

conditions, and that the maturity date on the modified loan clearly indicates January 2, 2037. [] Based on these express terms, the interest rate would change on April 1, 2013 pursuant to the provisions of the Adjustable Rate Rider, an addendum to the original Deed of Trust" a true and correct copy of which is already in the case file. This shows that defendants misled the plaintiffs as to what the missing terms of the contract contained.

2.      Declaration of Karen Stacy executed on September 15, 2010 and filed on September 16, 2010 in Lee v Equifirst Corp., United States District Court Case No. 3:10-cv-00809 for the Middle District of Tennessee, a true and correct copy of which is attached hereto as Exhibit 1. Karen Stacy is not a custodian of records for HomEq but a paralegal for Barclays. She has no personal knowledge of what she is declaring to and is not the custodian of records that maintained the records she is declaring to so she has no knowledge of whether or not they were recorded at or near the events so stated etc. It is inadmissible hearsay.

3.      Declaration of Karen Stacy executed on April 11, 2012 and filed on April 11, 2012 in Osborne v Equifirst Corporation, Case No. 3:12-cv-00172 for the Eastern District of Tennessee, a true and correct copy of which is attached hereto as Exhibit 2. Karen Stacy is not a custodian of records for HomEq but a paralegal for Barclays. She has no personal knowledge of what she is declaring to and is not the custodian of records that maintained the records she is declaring to so she has no knowledge of whether or not they were recorded at or near the events so stated etc. It is inadmissible hearsay.

4.      LinkedIn public profile for Karen Stacy noting her employment as "Senior Paralegal at Barclays Capital" as of June 30, 2012, a true and correct copy of which is attached hereto as Exhibit 3 and is a public document which can be found at linkedin.com. Karen Stacy is not a custodian of records for HomEq but a paralegal for Barclays. She has no personal knowledge of what she is declaring to and is not the custodian of records that maintained the records she is declaring to so she has no knowledge of whether or not they were recorded at or near the events so stated etc. It is inadmissible hearsay.

2

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

*GALOPE v DEUTSCHE BANK NATIONAL TRUST COMPANY*                    *SACV12-323-CJC (RNBx)*

5.      The Note of $522,000.00 indebting plaintiff Helen Galope with Allonge made out to Deutsche Bank National Trust Company, as trustee under Pooling and Servicing Agreement dated as of May 1, 2007 Securitized Asset-Backed Receivables LLC Trust 207-BR4 Mortgage Pass-Through Certificates, Series 2007-BR4, a true and correct copy of which is attached to Helen Galope's Declaration filed concurrently herewith. This proves that Deutsche Bank and the trust at issue are correctly identified defendants. Also Galope's loan was an Interest Only "IO" Adjustable rate mortgage "ARM" based on LIBOR.

6.      News story from Reuters.com dates June 27, 2012 by Alexandra Alper and Kirsten Ridley captioned "Barclays paying $453 million to settle Libor probe" a true and correct copy of which is attached hereto as Exhibit 4.

7.      June 27, 2012 press release from the United States Department of Justice announcing "Barclays Bank PLC Admits Misconduct Related to Submissions for the London Interbank Offered Rate and the Euro Interbank Offered Rate and Agrees to Pay $160 Million Penalty, a true and correct copy of which is attached hereto as Exhibit 5.

8.      June 26, 2012 Appendix A to the Non-Prosecution Agreement, dated June 26, 2012, between the United States Department of Justice, Criminal Division, Fraud Section, and Barclays Bank PLC, a true and correct copy of which is attached hereto as Exhibit 6. This proves Barclays manipulated or attempted to manipulate LIBOR.

9.      June 27, 2012 Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and Imposing Remedial Sanctions, before the Commodity Futures Trading Commission in the Matter of: Barclays PLC, Barclays Bank PLC and Barclays Capital Inc., CFTC Docket No. 12-25, a true and correct copy of which is attached hereto as Exhibit 7. This proves Barclays manipulated or attempted to manipulate LIBOR.

10.      LIBOR Rates History as of June 30, 2012 as published on fedprimerate.com, a true and correct copy of which is attached hereto as Exhibit 8. This is relevant to show a text message going to

**3**

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

*GALOPE v DEUTSCHE BANK NATIONAL TRUST COMPANY*                    *SACV12-323-CJC (RNBx)*

fix the LIBOR rate at the time Galope received her loan and that the request to fix was granted, tying to the US DOJ statement of facts.

11.     Securitized Asset Backed Receivables LLC Trust 2007-BR4 15 SEC Filings from 6/12/07 to 3/28/08, a true and correct copy of which is attached   hereto as Exhibit 9 and can be found as a public record at secinfo.com. This is relevant to show that the trust stopped reporting in 2008 and filed a Rule 15 report. Usually filed when the number of investors are below nine(9). Tends to show that Barclays called in the Swap in or about 2008 while it was manipulating the LIBOR market for swaps.

12.     Securitized Asset Backed Receivables LLC Trust 2007-BR4 424B5 filed on 6/14/07, a true and correct copy of which is attached hereto as Exhibit 10 and can be found as a public record at secinfo.com.

13.     Securitized Asset Backed Receivables LLC Trust 2007-BR4 FWP (Free Writing Prospectus) – Securitized Asset Backed Receivables LL Trust 2007-BR4 on 6/14/07, a true and correct copy of which is attached hereto as Exhibit 11 and can be found as a public record at secinfo.com. This is being offered  to show that there are 5,072 loans in this pool (number of potential class members) and LIBOR loans show up when doing a word search 3,232 times. The terms of Galope's loan, we believe we have identified as Loan Number 2792 was a LIBOR loan (the amount is misstated as $588,000.00 and not $522,000.00). Barclays was the depositor, servicer, and Swap provider and Deutsche Bank was the trustee.  Barclays admits it was doing business as HomEq.  HomEq is the entity that gave Galope her modification at issue. Barclays also admitted as shown above, manipulating the LIBOR rate for swaps.

14.     Request for Courtesy Notice of Electronic Filing (NEF) by Attorney Les Zieve on behalf of the Ocwen Loan Servicing, LLC the sub-servicer of plaintiff's loan filed on July 28, 2011 in the Matter of Galope, Case No. 11-bk-18339-MT Chapter 13, which was a few weeks before the debtor moved to vacate the dismissal and over a month before the Court order initiating the automatic stay in this case was filed. This is being offered to show that defendants received notice from the Court of the

**4**

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

*GALOPE v DEUTSCHE BANK NATIONAL TRUST COMPANY*          *SACV12-323-CJC (RNBx)*

stay before defendants transferred the property out of the bankruptcy estate and onto their books on September 1, 2011, a true and correct copy of which is attached hereto as Exhibit 12 and can be found as a public record at pacer.gov.

      15.    Court Order vacating the dismissal and reinstituting the automatic stay on August 30, 2011 in the Matter of Galope, Case No. 11-bk-18339-MT Chapter 13, two days before the sale according to the TDUS defendants filed in support of their motion, a true and correct copy of which is attached hereto as Exhibit 13 and can be found as a public record at pacer.gov.

Dated: July 2, 2012            Respectfully Submitted,
                                     LAW OFFICES OF LENORE ALBERT

                            /s/ Lenore Albert_____
                                     LENORE L. ALBERT, ESQ.
                                     Attorney for Plaintiff Helen Galope

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

*GALOPE v DEUTSCHE BANK NATIONAL TRUST COMPANY*        *SACV12-323-CJC (RNBx)*

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF ORANGE:
 I declare that I am over the age of 18 years, and not a party to the within action; that I am employed in Orange County, California; my business address is 7755 Center Avenue Suite #1100,Huntington Beach, CA  92647.
On July 2, 2012, I served a copy of the following document(s) described as:

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

On the interested parties in this action as follows:

See attached Mail List

**[x] BY CM/ECF –** I caused such document(s) to be transmitted to the office(s) of the addressee(s) listed above by electronic mail at the e-mail address(es) set forth pursuant to FRCP 5(d)(1).
[ ] **BY EMAIL –** I caused such document(s) to be transmitted to the office(s) of the addressee(s) listed above by electronic mail at the e-mail address(es) set forth herein.
[ ] **BY FAX –** I caused such document(s) to be transmitted facsimile from the offices located in Westminster, California this business day to the aforementioned recipients.
        I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Dated: July 2, 2012

s/ Lenore Albert
Lenore Albert

**1**

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

*GALOPE v DEUTSCHE BANK NATIONAL TRUST COMPANY*          *SACV12-323-CJC (RNBx)*

1

Mailing List

2

For Defendant Western Progressive, LLC and
3    Defendant Deutsche Bank National Trust Company:

4    Eric D. Hauser, Esq.
     Steven S. Son, Esq.
5    HOUSER & ALLISON
6    3760 Kilroy Airport Way, Suite 260
     Long Beach, CA 90806
7    Telephone: (949) 679-1111
     Fax: (949) 679-1112
8    Email: sson@houser-law.com

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**2**

**REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
MOTION FOR SUMMARY JUDGMENT**

*GALOPE v DEUTSCHE BANK NATIONAL TRUST COMPANY*                    *SACV12-323-CJC (RNBx)*

# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

TERI LEE,

        Plaintiff,

v.                                                   No. 3:10-cv-00809

EQUIFIRST CORP.,
HOMEQ SERVICING CORP.,
QUANTUM SERVICING CORP.,
SUTTON FUNDING, LLC. &
ROOSEVELT MORTGAGE ACQUISITION CO.,

        Defendants.

## DECLARATION OF KAREN L. STACY
## OF EQUIFIRST CORPORATION IN REGARD TO
## EQUIFIRST CORPORATION'S MOTION TO DISMISS

Pursuant to 28 U.S.C. § 1746, Karen L. Stacy declares as follows:

1.     I hold the position of Vice President with EquiFirst Corporation ("EquiFirst"). This declaration is based upon my personal knowledge and my review of records kept in the ordinary course of business by EquiFirst.

2.     As stated in the Complaint filed by Teri Lee ("Ms. Lee") in this action, EquiFirst closed on two home mortgage loans to Ms. Lee on March 2, 2007 (the "Loans").

3.     On March 30, 2007, EquiFirst sold both of the Loans to Sutton Funding, LLC.

4.     Because MERS was the beneficiary on the relevant security instruments, no assignment was prepared or recorded in the Register's Office of Davidson County, Tennessee.

5.      On May 1, 2007, EquiFirst transferred the servicing of both of the Loans to HomEq Servicing Corporation.

6.      EquiFirst was not, at any point in time, the creditor on the Loans during the periods of time in which the Loans were serviced by HomEq Servicing Corporation or by Quantum Servicing Corporation.

7.      After EquiFirst transferred the servicing of both Loans to HomEq Servicing Corporation on May 1, 2007, EquiFirst did not have, and EquiFirst continues not to have any ownership interest in the two Loans or the two corresponding liens on the subject property.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this the 15TH day of September, 2010.

KAREN L. STACY

2

Respectfully submitted,

s/ Kenneth P. Jones
KENNETH P. JONES (#16168)
kenjones@bhammlaw.com
Attorney for Defendant EquiFirst Corp.

BOURLAND, HEFLIN, ALVAREZ,
  MINOR, & MATTHEWS, PLC
5400 Poplar Avenue, Suite 100
Memphis, TN 38119
(901) 683-3526 (phone)
(901) 763-1037 (facsimile)

CERTIFICATE OF SERVICE

Undersigned counsel hereby certifies that a copy of the foregoing has been served upon the counsel of record in this case by the Court's electronic filing system, this 16th day of September, 2010.

s/ Kenneth P. Jones

3

# EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## NORTHERN DIVISION AT KNOXVILLE

JEFFREY SHANE OSBORNE and wife,
ANDREA OSBORNE,

      Plaintiffs,

v.                                No. _____

EQUIFIRST CORPORATION and

THE BANK OF NEW YORK MELLON TRUST
COMPANY, NA, AS GRANTOR TRUSTEE OF
THE PROTIUM MASTER GRANTOR TRUST,

      Defendants.

---

### DECLARATION OF KAREN STACY

---

Pursuant to 28 U.S.C. § 1746, Karen L. Stacy declares as follows:

1.      I hold the position of Vice President with EquiFirst Corporation ("EquiFirst"). This declaration is based upon my personal knowledge and my review of records kept in the ordinary course of business by EquiFirst.

2.      EquiFirst was incorporated in the State of North Carolina, and its principal place of business is located in the State of North Carolina.

3.      As stated in the Complaint filed by Jeffrey Shane Osborne and Andrea Osborne (the "Osbornes") in this action, the Osbornes own a certain parcel of real property located at 1115 Beechwood Drive, Dandridge, Tennessee  37725 (the "Property").

4.      The principal amount of the mortgage loan from EquiFirst to the Osbornes  secured

Page 1 of 2

by the Property and that closed on May 9, 2007 (the "Loan") was the sum of $245,000.

     5.    As part of the review process for the Loan, an appraisal of the Property was prepared by Mark Bebout of Highland Appraisals in Parrottsville, Tennessee, dated April 13, 2007 (the "Appraisal"). The Appraisal concluded that the fair market value of the Property was $350,000.00.

     6.    According to the State of Tennessee Comptroller of the Treasury, as of April 9, 2012, the total market appraisal of the Property for property tax purposes is the sum of $241,700.00. A copy of the printout from the State of Tennessee Comptroller of the Treasury is attached hereto as Exhibit A.

     7.    The estimated present fair market value of the Property is at least $200,000.00.


     I declare under penalty of perjury that the foregoing is true and correct. Executed on this the 11th day of April, 2012.

                                                          KAREN L. STACY

H:\KPJ\EquiFirst -- Osborne\Pleadings\Declaration.KarenStacy.04-11-2012.final.wpd

Page 2 of 2

# EXHIBIT 3

Do You Own A Business? - Discover the top 10 mistakes employers make to get sued. Free white paper!

## Karen Stacy
**Senior Paralegal with Barclays Capital**

LinkedIn: North Carolina Area | Legal Services

| | | |
|---|---|---|
| Current | **Senior Paralegal at Barclays Capital** | |
| Past | Senior Paralegal at EquiFirst Corporation | |
| Connections | **50 connections** | |
| Public Profile | http://www.linkedin.com/pub/karen-stacy/27/543/330 | |

Connect Karen for:

- consulting offers
- job inquiries
- business deals
- getting back in touch

- new ventures
- expertise requests
- reference requests

Send a message to Karen Stacy
Send InMail

LinkedIn Corporation © 2012

# EXHIBIT 4

» Print

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

# Barclays paying $453 million to settle Libor probe

Wed, Jun 27 2012

By Alexandra Alper and Kirstin Ridley

WASHINGTON/LONDON (Reuters) - U.K. bank Barclays will pay $453 million to U.S. and British authorities to settle allegations that it manipulated key interest rates, increasing pressure on other banks to cooperate in a probe that could cost the financial industry billions of dollars.



The settlement raises fresh questions about the reliability of the London interbank offered rate, or Libor, which underpins some $360 trillion of loans and financial contracts.

The attempted manipulation, which according to authorities took place from 2005 through 2009, meant that millions of borrowers paid too little or too much interest on their debt.

The U.S. government implicated senior executives at Barclays in its settlement. It cited reams of emails that showed how the bank sought to move Libor rates to profit on trades and to hide its high borrowing costs during the financial crisis.

Barclays Chief Executive Bob Diamond acknowledged on Wednesday that the settlement would damage customer trust in the bank. He said he and other senior executives would forgo their bonuses this year. Much of the improper trading and manipulation occurred under the watch of Diamond, a fixed-income trader who replaced John Varley as CEO in 2011.

Libor underlies everything from derivatives trades to U.S. consumer credit card rates to loans as far afield as those financing Turkish phone networks. Barclays also tried to manipulate Euribor, a separately managed series of euro-denominated rates.

The bank settled on a civil basis with the U.S. Commodity Futures Trading Commission, the U.S. Department of Justice and the U.K.'s Financial Services Authority. The Justice Department is still conducting a criminal investigation.

The broader Libor probe dates to at least 2011 and includes Japanese, Canadian and Swiss authorities.

Last year, Swiss bank UBS AG agreed to cooperate with U.S. investigators in exchange for conditional immunity from prosecution. Earlier this year, in court documents filed in Ontario Superior Court, a Canadian antitrust regulator said that a "cooperating party" had provided information on how the alleged Libor manipulation took place.

The Barclays settlement puts pressure on other banks to follow suit, a former U.S. prosecutor said.

"I don't think there is any question that the industry's total cost when you throw in class actions, regulatory settlements, going-forward compliance and even the professional fees associated with the defense of these matters, will be well into the tens of billions of dollars," said Jacob Frenkel, a partner at Shulman Rogers in Potomac, Maryland.

ON THE "BIG BOY" TRAIL

Investigators were helped by the extensive email traffic among Barclays employees involved. In one email, after a Barclays swaps trader asked for low levels to be reported on certain short-term rates, an employee who submitted rates for the survey responded by email, "Done ... for you big boy ..."

Market participants said that fewer traders have faith in Libor as a benchmark now.

"There isn't really a lot of trust in the way Libor is calculated as ... there were some banks who used to manipulate the rates just to get better conditions in the money market," said ING rate strategist Alessandro Giansanti in Amsterdam.

The series of interest rates are determined based on a daily poll of banks regarding their estimated borrowing costs. Libor is so deeply entrenched in financial markets that there are few plausible alternatives, experts have said.

SENIOR EXECUTIVES INVOLVED

Barclays shares closed 1.9 percent higher in London, as shareholders said they were satisfied the issue was closed.

In a statement, Barclays said the settlement related to past actions that fell "well short of the standards" the bank sought to uphold for its business.

"I am sorry that some people acted in a manner not consistent with our culture and values," Diamond said.

Diamond joined the bank in 1996 and established Barclays as a leading investment bank.

Before taking over as CEO, Diamond had been president and chief of Barclays' investment bank. The other officials who will forgo a bonus this year are finance chief Chris Lucas, chief operating officer Jerry del Missier, and Rich Ricci, chief executive of corporate and investment banking.

Damning emails that regulators released on Wednesday make clear that traders and the "submitters" tasked with reporting daily rates worked together for years to make the rates submitted suit the traders' and the bank's purposes.

In some cases, submitters set themselves reminders on their calendars to submit low rates on certain dates, according to the emails. In others, traders expressed overwhelming gratitude for low submissions that protected them from losses.

Around when the market for short-term debt known as commercial paper seized up in the fall of 2007, top Barclays treasury

executives held a conference call with the desk responsible for submitting Libor, according to the CFTC order.

The person responsible for posting Barclays' borrowing rate said in a November 2007 phone call that if the bank submitted a correct rate, it would be higher than other banks and cause "a shit storm." According to the CFTC order, "The supervisor asked that the issue be taken 'upstairs,' meaning that it should be discussed among more senior levels of Barclays' management."

Ultimately, the bank provided a lower rate that was the same as a competing bank.

RECORD FINES

The CFTC ordered the bank to pay a $200 million penalty, the largest civil monetary penalty it has ever imposed.

Barclays also settled with the U.S. Department of Justice and Britain's Financial Services Authority; it will pay fines of $160 million and $92.8 million, respectively. The FSA fine was also a record.

The Department of Justice said Barclays was the first bank being probed "to provide extensive and meaningful cooperation to the government," adding that the bank's assistance had aided its criminal investigation.

Though the Justice Department did not use words like "conspiracy" or "fraud" in its statement of facts, one lawyer not related to the case said that was likely a courtesy to Barclays as much as anything else.

"The DOJ did not want to back Barclays into a corner (by) using some of the more terrifying words from the criminal lexicon. I think it was very much a way to give Barclays a face-saving opportunity to resolve the situation," said Anthony Sabino, a professor of law at St. John's University.

"NO ONE'S CLEAN-CLEAN"

Libor is set daily for 10 major currencies and 15 borrowing periods, ranging from overnight loans to 12 months.

Thomson Reuters Corp is the British Bankers' Association's official agent for the daily calculation and publishing of Libor. The company said it continues to support the BBA in calculating and distributing Libor rates.

An economist who has studied Libor manipulation said that banks should be surveyed about their actual borrowing costs, instead of their estimated borrowing costs.

"Estimates are much easier to manipulate," said Rosa Abrantes-Metz, a principal at Global Economics Group and an adjunct professor at NYU's Stern School of Business.

The CFTC order suggested that the BBA knew of problems. In 2008, according to the CFTC order, a Barclays treasury executive told the BBA the bank hadn't reported accurate borrowing costs.

"We're clean, but we're dirty-clean, rather than clean-clean," the executive told an unnamed BBA manager, who responded, "No one's clean-clean."

The BBA, for its part, said the news would figure into its ongoing review of the structure of Libor.

"This is an announcement with extremely serious implications which need to be carefully considered and the investigation findings will be fully included in the current review of Libor," the association said.

Other banks involved in the probe include Citigroup, HSBC, Royal Bank of Scotland and UBS.

Several banks have suspended traders over the investigations. No criminal charges have been filed.

Even if banks settle with regulators, they still must contend with litigation now wending its way through federal court in New York.

(Reporting by Steve Slater, Kirstin Ridley, Sarah White, Carrick Mollenkamp, Jed Horowitz, Alexandra Alper, Tom Hals and Karey Wutkowski; Writing by Carrick Mollenkamp and Ben Berkowitz in New York, and Kirstin Ridley in London; Editing by John Wallace, Matthew Lewis, Tim Dobbyn and Jan Paschal)

© Thomson Reuters 2011. All rights reserved. Users may download and print extracts of content from this website for their own personal and non-commercial use only. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is expressly prohibited without the prior written consent of Thomson Reuters. Thomson Reuters and its logo are registered trademarks or trademarks of the Thomson Reuters group of companies around the world.

Thomson Reuters journalists are subject to an Editorial Handbook which requires fair presentation and disclosure of relevant interests.

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to colleagues, clients or customers, use the Reprints tool at the top of any article or visit: www.reutersreprints.com.

# EXHIBIT 5



THE COMMON LAW IS THE WILL OF *Mankind* ISSUING FROM THE *Life* OF THE *People*

SEARCH THE SITE

SEARCH

THE UNITED STATES
DEPARTMENT *of* JUSTICE

Home  » Briefing Room  » Justice News

Printer Friendly

JUSTICE NEWS

### Department of Justice

Office of Public Affairs

FOR IMMEDIATE RELEASE                                Wednesday, June 27, 2012

### Barclays Bank PLC Admits Misconduct Related to
### Submissions for the London Interbank Offered Rate and
### the Euro Interbank Offered Rate and Agrees to Pay $160
### Million Penalty

WASHINGTON – Barclays Bank PLC, a financial institution headquartered in London, has entered into an agreement with the Department of Justice to pay a $160 million penalty to resolve violations arising from Barclays's submissions for the London InterBank Offered Rate (LIBOR) and the Euro Interbank Offered Rate (EURIBOR), which are benchmark interest rates used in financial markets around the world, announced Assistant Attorney General Lanny A. Breuer of the Justice Department's Criminal Division and Assistant Director in Charge James W. McJunkin of the FBI's Washington Field Office.

As part of the agreement with the Department of Justice, Barclays has admitted and accepted responsibility for its misconduct set forth in a statement of facts that is incorporated into the agreement. According to the agreement, Barclays provided LIBOR and EURIBOR submissions that, at various times, were false because they improperly took into account the trading positions of its derivative traders, or reputational concerns about negative media attention relating to its LIBOR submissions. The Justice Department's criminal investigation into the manipulation of LIBOR and EURIBOR by other financial institutions and individuals is ongoing. The agreement requires Barclays to continue cooperating with the department in its ongoing investigation.

"LIBOR and EURIBOR are critically important benchmark interest rates," said Assistant Attorney General Breuer. "Because mortgages, student loans, financial derivatives, and other financial products rely on LIBOR and EURIBOR as reference rates, the manipulation of submissions used to calculate those rates can have significant negative effects on consumers and financial markets worldwide. For years, traders at Barclays encouraged the manipulation of LIBOR and EURIBOR submissions in order to benefit their financial positions; and, in the midst of the financial crisis, Barclays management directed that U.S. Dollar LIBOR submissions be artificially lowered. For this illegal conduct, Barclays is paying a significant price. To the bank's credit, Barclays also took a significant step toward accepting responsibility for its conduct by being the first institution to provide extensive and meaningful cooperation to the government. Its efforts have substantially assisted the Criminal Division in our ongoing investigation of individuals and other financial institutions in this matter."

"Barclays Bank's illegal activity involved manipulating its submissions for benchmark interest rates in order to benefit its trading positions and the media's perception of the bank's financial health," said Assistant Director in Charge McJunkin. "Today's announcement is the result of the hard work of the FBI Special Agents, financial analysts and forensic accountants as well as the prosecutors who dedicated significant time and resources to investigating this case."

Barclays was one of the financial institutions that contributed rates used in the calculation of LIBOR and EURIBOR. The contributed rates are generally meant to reflect each bank's assessment of the rates at which it could borrow unsecured interbank funds. For LIBOR, the highest and lowest 25% of contributed rates are excluded from the calculation and the remaining rates are averaged to calculate the fixed rates. For EURIBOR, the highest and lowest 15% are excluded and the remaining 70% are averaged to calculate the fixed rates.

Futures, options, swaps, and other derivative financial instruments traded in the over-the-counter market and on exchanges worldwide are settled based on LIBOR. Further, mortgages, credit cards, student loans and other consumer lending products often use LIBOR as a reference rate. According to the agreement, an individual bank's LIBOR or EURIBOR submission cannot appropriately be influenced by the financial positions of its derivatives traders or the bank's concerns about public perception of its financial health due to its LIBOR submissions.

According to the agreement, between 2005 and 2007, and then occasionally thereafter through 2009, certain Barclays traders requested that the Barclays LIBOR and EURIBOR submitters contribute rates that would benefit the financial positions held by those traders. The requests were made by traders in New York and London, via electronic messages, telephone conversations and in-person conversations.

DEFENDING THE
AFFORDABLE CARE ACT

JUSTICE.GOV *en* ESPAÑOL



DEPARTMENT *of* JUSTICE
ACTION CENTER

Report a Crime

Get a Job

Locate a Prison, Inmate, or Sex Offender

Apply for a Grant

Submit a Complaint

Report Waste, Fraud, Abuse or
Misconduct to the Inspector General

Find Sales of Seized Property

Find Help and Information for Crime
Victims

Register, Apply for Permits, or Request
Records

Identify Our Most Wanted Fugitives

Find a Form

Report and Identify Missing Persons

Contact Us

Case 3:12-cv-00325-CSC-RNB Document 45-1 Filed 07/02/12 Page 22 of 111 PageID #:1345

The employees responsible for the LIBOR and EURIBOR submissions accommodated those requests on numerous occasions in submitting the bank's contributions. On some occasions, Barclays's submissions affected the fixed rates.

In addition, between August 2005 and May 2008, certain Barclays traders communicated with traders at other financial institutions, including other banks on the LIBOR and EURIBOR panels, to request LIBOR and EURIBOR submissions that would be favorable to their or their counterparts' trading positions, according to the agreement.

When the requests of traders for favorable LIBOR and EURIBOR submissions were taken into account by the rate submitters, Barclays's rate submissions were false and misleading.

Further, according to the agreement, between approximately August 2007 and January 2009, in response to initial and ongoing press speculation that Barclays's high U.S. Dollar LIBOR submissions at the time might reflect liquidity problems at Barclays, members of Barclays management directed that Barclays's Dollar LIBOR submissions be lowered. This management instruction often resulted in Barclays's submission of false rates that did not reflect its perceived cost of obtaining interbank funds. While the purpose of this particular conduct was to influence Barclays's rate submissions, as opposed to the resulting fixes, there were some occasions when Barclays's submissions affected the fixed rates.

The agreement and monetary penalty recognize Barclays's extraordinary cooperation. Barclays made timely, voluntary and complete disclosure of its misconduct. After government authorities began investigating allegations that banks had engaged in manipulation of benchmark interest rates, Barclays was the first bank to cooperate in a meaningful way in disclosing its conduct relating to LIBOR and EURIBOR. Barclays's disclosure included relevant facts that at the time were not known to the government. Barclays's cooperation has been extensive, in terms of the quality and type of information and assistance provided, and has been of substantial value in furthering the department's ongoing criminal investigation. Barclays has made a commitment to future cooperation with the department and other government authorities in the United States and the United Kingdom.

Assistant Attorney General Breuer further stated, "As today's agreement reflects, we are committed to holding companies accountable for their misconduct while, at the same time, giving meaningful credit to companies that provide full and valuable cooperation in our investigations."

In addition, Barclays has implemented a series of compliance measures and will implement additional internal controls regarding its submission of LIBOR and EURIBOR contributions, as required by the Commodity Futures Trading Commission (CFTC). Barclays will also continue to be supervised and monitored by the FSA.

The agreement and monetary penalty further recognize certain mitigating factors to Barclays's misconduct. At times, Barclays employees raised concerns with the British Bankers' Association, the United Kingdom Financial Services Authority (FSA), the Bank of England, and the Federal Reserve Bank of New York in late 2007 and in 2008 that the Dollar LIBOR rates submitted by contributing banks, including Barclays, were too low and did not accurately reflect the market. Further, during this time, notwithstanding Barclays's improperly low Dollar LIBOR submissions, those submissions were often higher than the contributions used in the calculation of the fixed rates.

As a result of Barclays's admission of its misconduct, its extraordinary cooperation, its remediation efforts and certain mitigating and other factors, the department agreed not to prosecute Barclays for providing false LIBOR and EURIBOR contributions, provided that Barclays satisfies its ongoing obligations under the agreement for a period of two years. The non-prosecution agreement applies only to Barclays and not to any employees or officers of Barclays or any other individuals.

In a related matter, the CFTC brought attempted manipulation and false reporting charges against Barclays, which the bank agreed to settle. The CFTC imposed a $200 million penalty and required Barclays to implement detailed measures designed to ensure the integrity and reliability of its benchmark interest rate submissions.

The FSA issued a Final Notice regarding its enforcement action against Barclays, and has imposed a penalty of £59.5 million against it.

The case is being handled by Deputy Chief Daniel Braun, Assistant Chiefs Rebecca Rohr and Robertson Park, Trial Attorney Alexander Berlin, and Special Trial Attorney Luke Marsh of the Criminal Division's Fraud Section. The investigation is being conducted by the FBI's Washington Field Office, jointly with the Antitrust Division of the Department of Justice.

The Department acknowledges and expresses its appreciation for the significant assistance provided by the CFTC's Division of Enforcement, which referred the conduct to the Department, as well as the FSA's Enforcement and Financial Crime Division.

This agreement is part of efforts underway by President Barack Obama's Financial Fraud Enforcement Task Force. President Obama established the interagency Financial Fraud Enforcement Task Force to wage an aggressive, coordinated and proactive effort to investigate and prosecute financial crimes. The task force includes representatives from a broad range of federal agencies, regulatory authorities, inspectors general and state and local law enforcement who, working together, bring to bear a powerful array of criminal and civil enforcement resources. The task force is working to improve efforts across the federal executive branch, and with state and local partners, to investigate and prosecute significant financial crimes, ensure just and effective punishment for those who perpetrate financial crimes,

STAY CONNECTED

 Sign up for E-Mail Updates
Subscribe to News Feeds

  
Facebook   Twitter   YouTube

combat discrimination in the lending and financial markets, and recover proceeds for victims of
financial crimes. For more information about the task force visit: www.stopfraud.gov.

12-815                                                          Criminal Division

## U.S. DEPARTMENT *of* JUSTICE    950 Pennsylvania Avenue, NW, Washington, DC 20530-0001

**ABOUT**
The Attorney General
DOJ Agencies
Budget & Performance
Strategic Plans

**BUSINESS & GRANTS**
Business Opportunities
Small & Disadvantaged
Business
Grants

**RESOURCES**
Forms
Publications
Case Highlights
Legislative Histories

**BRIEFING ROOM**
Justice News
The Justice Blog
Videos
Photo Library

**CAREERS**
Legal Careers
Student Opportunities
Internships

**CONTACT**

## JUSTICE.GOV

Site Map
A to Z Index
Archive
Accessibility
FOIA
No FEAR Act
Information Quality
Privacy Policy
Legal Policies &
Disclaimers

For Employees
Office of the Inspector
General
Government
Resources
USA.gov

# EXHIBIT 6

## APPENDIX A

## STATEMENT OF FACTS

This Statement of Facts is incorporated by reference as part of the non-prosecution agreement, dated June 26, 2012, between the United States Department of Justice, Criminal Division, Fraud Section, and Barclays Bank PLC.  The parties agree that the following information is true and accurate:

### BACKGROUND

#### *LIBOR and EURIBOR*

1.   Since its inception in approximately 1986, the London Interbank Offered Rate ("LIBOR") has been a benchmark interest rate used in financial markets around the world. Futures, options, swaps, and other derivative financial instruments traded in the over-the-counter market and on exchanges worldwide are settled based on LIBOR.  The Bank of International Settlements has estimated that in the second half of 2009, the notional amount of over-the-counter interest rate derivatives contracts was valued at approximately $450 trillion.  In addition, mortgages, credit cards, student loans, and other consumer lending products often use LIBOR as a reference rate.

2.   LIBOR is published under the auspices of the British Bankers' Association ("BBA"), a trade association with over 200 member banks that addresses issues involving the United Kingdom banking and financial services industries.  The BBA defines LIBOR as:

> The rate at which an individual Contributor Panel bank could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size, just prior to 11:00 [a.m.] London time.

This definition has been in place since approximately 1998.

3.   LIBOR is calculated for ten currencies.  The LIBOR for a given currency is the result

of a calculation based upon submissions from a panel of banks for that currency (the "Contributor Panel") selected by the BBA. Each member of the Contributor Panel submits its rates every London business day through electronic means to Thomson Reuters, as an agent for the BBA, by 11:10 a.m. London Time. Once each Contributor Panel bank has submitted its rate, the contributed rates are ranked. The highest and lowest quartiles are excluded from the calculation, and the middle two quartiles (i.e., 50% of the submissions) are averaged to formulate the resulting LIBOR "fix" or "setting" for that particular currency and maturity.

4. The LIBOR contribution of each Contributor Panel bank is submitted to between two and five decimal places, and the LIBOR fix is rounded, if necessary, to five decimal places. In the context of measuring interest rates, one "basis point" is one-hundredth of one percent (0.01%).

5. Thomson Reuters calculates and publishes the rates each business day by approximately 11:30 a.m. London Time. Fifteen maturities (or "tenors") are quoted for each currency, ranging from overnight to twelve months. The published rates are made available worldwide by Thomson Reuters and other data vendors through electronic means and through a variety of information sources. In addition to the LIBOR fix resulting from the calculation, Thomson Reuters publishes each Contributor Panel bank's submitted rates along with the names of the banks.

6. According to the BBA, from at least 2005 to the present, each Contributor Panel bank must submit its rate without reference to rates contributed by other Contributor Panel banks. The basis for a Contributor Panel bank's submission, according to the BBA, must be the rate at which members of the bank's staff primarily responsible for management of a bank's cash, rather than a

2

bank's derivative trading book, consider that the bank can borrow unsecured interbank funds in the London money market.  Further according to the BBA, a Contributor Panel bank may not contribute a rate based on the pricing of any derivative financial instrument.  In other words, a Contributor Panel bank's LIBOR submissions should not be influenced by its motive to maximize profit or minimize losses in derivative transactions tied to LIBOR.

7.  The Contributor Panel for United States Dollar ("Dollar") LIBOR from at least 2005 through 2010 comprised 16 banks, including Barclays.  Presently, there are 18 banks on the Dollar Contributor Panel, including Barclays.  From at least 2005 through the present, Barclays has also been a member of the Contributor Panels for, among other currencies, Yen LIBOR and Sterling LIBOR.

8.  From at least 2005 to the present, Barclays has also been a member of the Contributor Panel for the Euro Interbank Offered Rate ("EURIBOR").  EURIBOR is a reference rate overseen by the European Banking Federation ("EBF"), which is based in Brussels, Belgium.  Since 2005, the EURIBOR Contributor Panel has comprised approximately 42 to 48 banks.  EURIBOR is the rate at which Euro interbank term deposits within the Euro zone are offered by one prime bank to another, at 11:00 a.m. Brussels time.  Thomson Reuters, as an agent of the EBF, calculates and publishes the rates each business day.   Each EURIBOR Contributor Panel bank submits its contributed rate to Thomson Reuters through electronic means, and then the contributed rates are ranked.  The highest and lowest 15% of all the quotes are excluded from the calculation, and the remaining rates (i.e., the middle 70%) are averaged to formulate the resulting EURIBOR fix for each tenor.  The published rates, and each Contributor Panel bank's submitted rates, are made available worldwide through electronic means and through a variety of

information sources.

*Eurodollar Futures Contracts*

9.   Eurodollar futures contracts traded on the Chicago Mercantile Exchange ("CME") are

settled based on LIBOR.   Eurodollar futures contracts are highly liquid, and each has a notional

value of $1 million.  A "Eurodollar" is a Dollar deposit with a bank outside of the United States.

A Eurodollar futures contract is essentially the interest that would be paid on a Eurodollar

deposit of $1 million for a term of three months.  Prior to the settlement date, the price of a 3-

month Eurodollar futures contract is an indication of the market's prediction of the 3-month

Dollar LIBOR on its settlement date.  The actual settlement price of a 3-month contract is

calculated as 100 minus the 3-month Dollar LIBOR on the settlement date.  Most Eurodollar

futures contracts settle on four quarterly International Money Market ("IMM") dates, which are

the third Wednesday of March, June, September, and December.  The last trading days are the

second London bank business day prior to the third Wednesday (i.e., usually Monday) in those

months.  In 2009, according to the Futures Industry Association, more than 437 million

Eurodollar futures contracts were traded on the CME.

*Barclays*

10.   Barclays Bank PLC is a financial services corporation with headquarters located in

London, England.  Barclays Bank PLC has banking subsidiaries around the world, including in

the United States, and Barclays Bank PLC has a branch in New York.  Barclays Capital Inc. is a

wholly-owned subsidiary of Barclays Bank PLC that engages in investment banking, wealth

management, and investment management services.  (Collectively, Barclays Bank PLC and

Barclays Capital Inc. are referred to as "Barclays").  Barclays employs derivatives traders in

4

New York, New York and in London, England who trade financial instruments tied to LIBOR
and EURIBOR, including interest rate swaps and Eurodollar futures contracts ("swaps traders").
Barclays employees on its money markets desk in London have been responsible for contributing
Barclays's Dollar, Sterling, and Yen LIBOR and its EURIBOR submissions ("submitters").

## BARCLAYS'S MANIPULATION OF ITS LIBOR AND EURIBOR SUBMISSIONS

### Swaps Traders' Requests for Favorable Settings

*Swaps Traders' Requests Within Barclays*

11.  From approximately 2005 through 2007, and occasionally thereafter through
approximately 2009, certain Barclays swaps traders requested that certain Barclays LIBOR and
EURIBOR submitters submit LIBOR and EURIBOR contributions that would benefit the
traders' trading positions, rather than rates that complied with the definitions of LIBOR and
EURIBOR.  Those swaps traders either proposed a particular LIBOR or EURIBOR contribution
for a particular tenor and currency, or proposed that the rate submitter contribute a rate higher,
lower, or unchanged for a particular tenor and currency.  The swaps traders made these requests
via electronic messages, telephone conversations, and in-person conversations.  The LIBOR and
EURIBOR submitters agreed to accommodate, and accommodated, the swaps traders' requests
for favorable LIBOR and EURIBOR submissions on numerous occasions.

12.  From at least as early as June 2005 through approximately September 2007, in New
York, New York and in London, England, several Barclays Dollar swaps traders made frequent
requests for favorable Dollar LIBOR contributions to the Barclays Dollar LIBOR submitters on
the London money markets desk.  From approximately September 2007 through approximately
May 2009, such requests were made occasionally.  Barclays Dollar LIBOR submitters

5

accommodated the requests on numerous occasions and submitted Barclays's Dollar LIBOR
contributions consistent with the requests.

13.   For example, on Friday, March 10, 2006, a Barclays Dollar swaps trader located in
London ("Trader-1") sent an e-mail to a Barclays Dollar LIBOR submitter ("Submitter-1")
stating: "Hi mate[.] We have an unbelievably large set on Monday (the IMM).  We need a really
low 3m [3-month] fix, it could potentially cost a fortune.  Would really appreciate any help, I'm
being told by my NYK [counterparts in New York] that it's extremely important.  Thanks."
Then, on Monday, March 13, 2006, at approximately 7:48 a.m., Trader-1 wrote to Submitter-1:
"The big day has[] arrived...My NYK were screaming at me about an unchanged 3m libor.  As
always, any help wd [would] be greatly appreciated.  What do you think you'll go for 3m?"
Submitter-1 responded, "I am going 90 altho[ugh] 91 is what I should be posting."  Trader-1
replied in part: "I agree with you and totally understand.  Remember, when I retire and write a
book about this business your name will be in golden letters...."  Submitter-1 replied, "I would
prefer this not be in any books!"  Barclays's 3-month Dollar LIBOR submission on March 13,
2006 was 4.90%, which was a rate unchanged from the previous trading day and was tied for the
lowest rate submitted.

14.   As another example, on February 22, 2006, at approximately 9:42 a.m., Trader-1 sent
an e-mail to another Barclays Dollar LIBOR submitter ("Submitter-2") stating, "Hi (again)
We're getting killed on our 3m resets, we need them to be up this week before we roll out of our
positions.  Consensus for 3m today is 4.78 - 4.7825, it would be amazing if we could go for
4.79...Really appreciate ur help mate."  (ellipses in original).  Submitter-2 responded, "Happy to
help."  Barclays's 3-month Dollar LIBOR submission on February 22, 2006 was 4.79%.

6

15.  As a further example, on December 19, 2006, a swaps trader located in New York, New York ("Trader-2") sent an e-mail to Submitter-1 with the subject line, "3m Libor," asking, "Can you pls [please] continue to go in for 3m Libor at 5.365 or lower, we are all very long cash here in ny."  Submitter-1 asked, "How long for [Trader-2]?"  Trader-2 replied, "Until the effective date goes over year end (i.e. turn drops out) if possible."  Submitter-1 replied, "Will do my best sir."  Trader-2 replied, "Thx."  On December 19, 20, and 21, 2006, Barclays's 3-month Dollar LIBOR submissions were 5.37%, 5.37%, and 5.375%, respectively.  On December 21, 2006, at approximately 12:05 p.m., Trader-2 forwarded the December 19 correspondence to Submitter-1.  At approximately 12:05 p.m., Submitter-1 forwarded Trader-2's e-mail to Submitter-2, stating, "whoops."  At approximately 1:03 p.m., Submitter-1 created an electronic calendar entry stating, "SET 3 MONTH US$ LIBOR LOW!!!!!!" (emphasis in original) that was scheduled to begin on December 22, 2006 at 9:00 a.m. and continue until January 1, 2007 at 9:30 a.m.  On December 22, 2006 and the subsequent trading days through the end of the year, Barclays's 3-month Dollar LIBOR submissions were 5.36%, 5.365%, 5.35%, and 5.36%, respectively.

16.  As another example, on July 29, 2007, at approximately 9:45 p.m., Trader-2 sent an e-mail to Submitter-1, with a copy to a supervising trader in New York, New York ("Trader-3"), with the subject line, "3m cash," stating, "Pls [please] go for 5.36 libor again, very important that the setting comes as high as possible.....thanks." (ellipses in original).  Barclays's 3-month Dollar LIBOR submission on July 30, 2007 was 5.36%.

17.  In addition, from at least as early as May 2005 through approximately September 2007, certain Barclays Euro swaps traders in London submitted requests for favorable

7

EURIBOR settings to Barclays EURIBOR submitters in London on an ongoing basis.  From
approximately September 2007 through at least approximately May 2009, such requests were
made occasionally.  Barclays rate submitters for EURIBOR accommodated the requests by Euro
swaps traders on numerous occasions and submitted Barclays's EURIBOR contributions
consistent with the requests.

    18.  As an example, on July 28, 2006, at approximately 8:26 a.m., a Barclays Euro swaps
trader ("Trader-4") sent an e-mail to a Barclays EURIBOR submitter ("Submitter-3") with the
subject line, "6m fixing," stating, "Plz [Please] go for LOW 6M fixing today." (emphasis in
original).  Submitter-3 replied in part, "No probs...low it is today." (ellipses in original).
Barclays's 6-month EURIBOR submission on July 28, 2006 was 3.21%, which was 12 basis
points lower than its submission the previous day, and was lower than the lowest rate used in the
calculation of the EURIBOR fix.

    19.  As a further example, on Friday, October 13, 2006, a Barclays Euro swaps trader
("Trader-5") sent an electronic communication to Submitter-3 stating in part, "I have a huge
fixing on monday...something like 30bn 1m fixing...and i would like it to be very very very
high....can you do something to help?  i know a big clearer will be ag[a]inst us...and dont [sic]
want to loose money [sic] on that one." (ellipses in original).  Submitter-3 replied that s/he had
been moved within Barclays, but had forwarded the request to another EURIBOR submitter
("Submitter-4") who was covering for Submitter-3.  Submitter-3 forwarded the request to
Submitter-4 and added, "We always try and do our best to help out..." (ellipses in original).
Barclays's 1-month EURIBOR submission on Monday, October 16, 2006, was 3.36%, which
was 1 basis point higher than its submission the previous day and was equal to the second-

highest rate submitted by EURIBOR Contributor Panel banks.  Within the Contributor Panel, Barclays moved from being tied for the 6th highest rank on the previous trading day to being tied for the 2nd highest rank.

20.  In some instances, from at least as early as August 2006 through approximately January 2007, then on another occasion in approximately June 2009, Barclays Yen swaps traders made requests for favorable Yen LIBOR settings to the Barclays Yen LIBOR submitters. Barclays rate submitters for Yen LIBOR accommodated the requests on some occasions.

21.  The purpose of this activity was to manipulate Barclays's Dollar and Yen LIBOR contributions and its EURIBOR contributions, whether by increasing, decreasing, or maintaining the submitted rates, to influence the resulting LIBOR and EURIBOR fixes and thus to have a favorable effect on the swaps traders' trading positions.  Because certain swaps traders' compensation was based in part on the profit and loss calculation of the trading books, a purpose of the requests by the swaps traders was to benefit their compensation as well.

22.  Because of the high value of the notional amounts underlying derivative transactions tied to LIBOR and EURIBOR, even very small movements in those rates could have a significant impact on the profitability of a trader's trading portfolio.  As an example of the potential impact of this activity, on September 28, 2005, in a series of electronic messages, Trader-3 and Trader-1 discussed the next day's 3-month LIBOR submission.  Trader-3 stated, "WE WANT TOMORROW'S FIX TO BE 4.07 MINIMUM," repeating, "4.07....NOTHING LESS..." (emphasis and ellipses in original).  Trader-3 explained: "We have turn exposure of 837 futures contracts.  [F]or every 0.25 bps tomorrows [sic] fix is below 4.0525 we lose 154,687.50 usd [United States Dollars]...if tomorrows [sic] fix comes in at 4.0325 we lose 618,750 usd."

9

(ellipses in original).  Trader-1 replied in part, "I'll ask [Submitter-1] to go for 4.07."

Barclays's 3-month Dollar LIBOR submission on September 29, 2005 was 4.07%, which was

the highest rate submitted by any Contributor Panel bank.

*Interbank Swaps Trader Requests*

23.  From at least approximately August 2005 through at least approximately May 2008,

certain Barclays swaps traders communicated with swaps traders at other Contributor Panel

banks and other financial institutions about requesting LIBOR and EURIBOR contributions that

would be favorable to the trading positions of the Barclays swaps traders and/or their

counterparts at other financial institutions.

24.  Certain Barclays swaps traders made requests of traders at other Contributor Panel

banks for favorable LIBOR or EURIBOR submissions from those banks.  In addition, certain

Barclays swaps traders received requests from traders at other banks for favorable LIBOR or

EURIBOR submissions from Barclays rate submitters.  When Barclays swaps traders did not

have trading positions conflicting with their counterparts' requests, those Barclays swaps traders

sometimes would agree to request a LIBOR or EURIBOR submission from the Barclays LIBOR

or EURIBOR submitters that would benefit their counterparts' positions.  Those interbank

communications included ones in which certain Barclays swaps traders communicated with

former Barclays swaps traders who had left Barclays and joined other financial institutions.  The

likelihood that the LIBOR or EURIBOR fix would be affected increased when other Contributor

Panel banks also manipulated their submissions as part of a coordinated effort.

25.  From at least approximately August 2006 through at least approximately June 2007,

Trader-1, who had left Barclays and joined a financial institution that was not a member of the

10

Dollar LIBOR Contributor Panel, requested favorable Dollar LIBOR submissions from a current

Barclays Dollar swaps trader in London ("Trader-6"), who agreed to make such requests of the

Barclays Dollar LIBOR submitter.  Barclays's Dollar LIBOR submissions were consistent with

Trader-1's requests on numerous occasions.  In addition, from approximately March 2006

through approximately February 2007, another former Barclays Dollar swaps trader who had

joined another financial institution occasionally communicated with Barclays swaps traders

about requests for favorable Dollar LIBOR submissions.

     26.  As an example, on October 26, 2006, at approximately 7:12 a.m., Trader-1

communicated by electronic messages with Trader-6, stating, "where do u think 3m libor will be

today?"  Trader-6 replied, "[Submitter-1] thinks 38."  Trader-1 responded in part:

"wow...unchanged!!!?!??!  Short dates have rallied by 0.75bp... So I take it he's going

unchanged?  If it comes in unchanged I'm a dead man ha ha." (ellipses in original).  Trader-6

replied, "i'll [sic] have a chat."  Later that day, Trader-1 wrote: "Dude I owe you big time!

Come over one day after work and I'm opening a bottle of Bollinger!  Thanks for the libor."

Trader-6 replied, "know [sic] worries!!!"  Barclays's 3-month Dollar LIBOR submission on

October 26, 2006 was 5.375%, which was lower than Barclays's submission on the previous

trading day.

     27.  As another example, on March 29, 2007, at approximately 6:22 a.m., Trader-1

communicated by electronic messages with Trader-6, stating in part, "I know I'm asking for

much, but ONLY if u guys care, a low 3m libor would be great...anywhere below 5.35...thanks

dude." (ellipses in original).  Later that day, Trader-1 wrote to Trader-6, "Dude, thanks a lot for

the libor, can you PLEASE thank [Submitter-1] as well :-)."  Trader-6 replied, "anything for

you!!!" Trader-1 responded, "seriously, thanks a million dude." Barclays's 3-month Dollar

LIBOR contribution on March 29, 2007 was 5.345%.

28.   From at least approximately August 2005 to at least approximately May 2008,

Barclays Euro swaps traders communicated with swaps traders at other financial institutions that

were members of the EURIBOR Contributor Panel about requesting favorable EURIBOR

submissions from the EURIBOR submitters at their respective banks.  At Barclays, this conduct

was primarily undertaken by a Barclays Euro swaps trader, Trader-5, who left Barclays and

joined another financial institution in approximately May 2007.  While Trader-5 worked at

Barclays, Trader-5 communicated with traders at several other Contributor Panel banks about

obtaining favorable EURIBOR submissions, and requested favorable EURIBOR submissions

from the Barclays EURIBOR submitter.  After Trader-5 joined another financial institution,

Trader-5 continued communicating with traders at Barclays about requesting favorable

EURIBOR settings.

29. As an example, during at least approximately February and March 2007, in addition

to contacting the Barclays EURIBOR submitter, Trader-5 communicated with traders at four

other EURIBOR Contributor Panel banks and requested that their respective EURIBOR

submitters submit low 3-month EURIBOR contributions on March 19, 2007, which was the

Monday before the March IMM date.  That trading date was particularly significant for Trader-5,

who stated that s/he had accumulated financial positions that would benefit from a low 3-month

EURIBOR.  In one example of Trader-5's contacts with other banks, on February 6, 2007, in an

electronic message, a trader at another Contributor Panel bank asked Trader-5: "[I]n march do

you still want a very low 3m cash fixing for imm?"  Trader-5 replied, "yeah."  The other trader

12

continued, "I'm going to put pressure on the treasury so that he sets it very low." Trader-5
replied, "750k eur/bp [Euros per basis point]." Then, on March 19, 2007, before the EURIBOR
submission was due, Trader-5 sent a message to Submitter-3 stating in part: "I am hearing u are
bidding the cash....we really need a low 3m," and "as discussed could u put the 3m as low as
possible." (ellipses in original). Submitter-3 replied, "[W]ill do my best." Later on March 19,
2007, Trader-5 wrote to a trader at one of these other Contributor Panel banks, stating in part,
"this is the way you pull off deals like this," and "the trick is you must not do this alone."
Trader-5 also stated that after his "2months of preparation" [sic] he had made money in the end.
Trader-5 added, "[D]on't talk about it too much" and "don't make any noise about it please." On
that same date, Trader-5 wrote to a third trader whom he had previously contacted at another of
the Contributor Panel banks and said: "Please [trader name] don't make any noise about the 3m
fixing. [T]his can backfire against us."

*The Implications of the Swaps Traders' Requests*

30. When Barclays swaps traders made requests of Barclays rate submitters in order to
influence Barclays's benchmark interest rate submissions, and when the submitters
accommodated those requests, the manipulation of the submissions affected the fixed rates on
some occasions.

31. Barclays entered into interest rate derivatives transactions tied to LIBOR and
EURIBOR – such as swaps, forward rate agreements, and futures – with counterparties to those
transactions. Many of those counterparties were located in the United States. Those United
States counterparties included, among others, asset management corporations, retirement funds,
mortgage and loan corporations, and insurance companies. Those counterparties also included

13

banks and other financial institutions in the United States or located abroad with branches in the
United States.

32.  In the instances when the published rates were manipulated in Barclays's favor due
to Barclays's manipulation of its submissions, that manipulation benefitted Barclays swaps
traders, or minimized their losses, to the detriment of counterparties, at least with respect to the
particular transactions comprising the trading positions that the traders took into account in
making their requests to the rate submitters.  Certain Barclays swaps traders and rate submitters
who engaged in efforts to manipulate LIBOR and EURIBOR submissions were well aware of the
basic features of the derivatives products tied to these benchmark interest rates; accordingly,
they understood that to the extent they increased their profits or decreased their losses in certain
transactions from their efforts to manipulate rates, their counterparties would suffer
corresponding adverse financial consequences with respect to those particular transactions.

33.  When the requests of swaps traders for favorable LIBOR and EURIBOR
submissions were taken into account by the rate submitters, Barclays's rate submissions were
false and misleading.  In making and in accommodating the requests, the swaps traders and
submitters were engaged in a deceptive course of conduct in an effort to gain an advantage over
their counterparties.  As part of that effort: (1) swaps traders and submitters submitted and
caused the submission of materially false and misleading LIBOR and EURIBOR contributions;
and (2) swaps traders, after initiating and continuing their effort to manipulate LIBOR and
EURIBOR contributions, negotiated and entered into derivative transactions with counterparties
that did not know that Barclays employees were often attempting to manipulate the relevant rate.
Moreover, those false and misleading Dollar LIBOR contributions affected or tended to affect

14

the price of commodities, including Eurodollar futures contracts.

**Instruction by Barclays Management to Submit Lower LIBOR Contributions**

34.  According to an August 10, 2007 BBA press release, LIBOR closely reflected the real rates of interest being used by the world's large banks, and it reflected the actual rates at which banks borrowed money from each other.

35.  Because a bank's LIBOR contributions, even if they are not based entirely on actual money market transactions, should correspond to the cost at which the bank concludes that it can borrow funds, a bank's LIBOR contribution may be perceived as an indicator of a bank's financial health.  If a bank's LIBOR submission is relatively high, that rate could suggest that the bank is paying a relatively high amount to borrow funds.  Thus, a bank could be perceived to be experiencing financial difficulties because lenders were charging higher rates to that bank.  In addition, higher LIBOR contributions could signal that a bank is willing to pay higher amounts for funds, indicating potential liquidity problems.

36.  From approximately August 2007 through at least approximately January 2009, Barclays often submitted inaccurate Dollar LIBORs that under-reported its perception of its borrowing costs and its assessment of where its Dollar LIBOR submission should have been.  Certain members of management of Barclays, including senior managers in the treasury department and managers of the money markets desk, directed that the Barclays Dollar LIBOR submitters contribute rates that were nearer to the expected rates of other Contributor Panel banks rather than submitting the proper, higher LIBORs.  Barclays Dollar LIBOR submitters, following the direction from certain members of management, submitted rates that they believed would be consistent with the submissions of other Dollar LIBOR Contributor Panel banks, or at

15

least, that would not be too far above the expected rates of other members of the Contributor
Panel. Consequently, on some occasions, Barclays submitted rates that were false because they
were lower than Barclays otherwise would have submitted and contrary to the definition of
LIBOR.

37. According to internal Barclays communications, for certain time periods, Barclays
management instructed the Barclays Dollar LIBOR submitters not to be an "outlier" compared to
other Contributor Panel banks, even if Barclays contributed the highest rate; Barclays could be
"at the top of the pack" but not too far above the next highest contributor. In adopting that
approach, certain managers believed that Barclays's submitted rates typically would be in the
upper quartile of rates submitted by the Contributor Panel banks and thus excluded from the
rates used in the calculation of the LIBOR fix. For certain other periods, however, management
did not want Barclays to submit a rate higher than other Contributor Panel banks, and instructed
the Dollar LIBOR submitters to stay "within the pack" of other members of the Dollar LIBOR
Contributor Panel, and to submit rates "in line" with the other contributors. To the extent that
those managers had any concerns about Barclays's submissions being used in the calculation of
the LIBOR fix, those concerns apparently were outweighed by their priority for Barclays's
submissions to be "within the pack."

38. On several occasions, e-mail messages and phone conversations involving a Barclays
Dollar LIBOR submitter reflected the LIBOR submitter's belief that, due to the pressure from
Barclays management, Barclays was submitting its LIBOR contributions lower than the rate at
which Barclays was borrowing or could have borrowed funds, and lower than the rate at which
Barclays should have been submitting its LIBOR contributions, and thus that submitter believed

16

s/he was contributing a false rate.

39.   Barclays's submissions of improperly low Dollar LIBORs as a result of management instructions began in approximately late August 2007.   That month, Barclays twice drew on the Bank of England's emergency liquidity facility (known as the "window"), borrowing approximately £1.6 billion the second time.  News articles about the withdrawals in late August 2007 noted a decline in Barclays's share price and questioned Barclays's liquidity position, while Barclays explained publicly that the visits to the window were due to technical glitches. Meanwhile, because of the onset of the financial crisis, there was diminished liquidity in funding markets, and Barclays set certain of its LIBOR submissions relatively high compared to other Contributor Panel banks.  In early September 2007, Barclays received negative press coverage concerning Barclays's high LIBOR submissions in Sterling, Euro, and Dollar.  A news article questioned Barclays's liquidity position, in light of Barclays's high LIBOR submissions and its visits to the Bank of England's window, and noted that Barclays's share price had fallen.

40.    Senior managers within Barclays expressed concern about the negative publicity. The managers on the money markets desk and in the treasury department who gave the instruction to submit lower LIBORs, which resulted in improperly low LIBOR submissions, sought to avoid inaccurate, negative attention about Barclays's financial health as a result of its high LIBOR submissions relative to other banks.  Those managers wanted to prevent any adverse conclusions about Barclays's borrowing costs, and more generally, its financial condition, because they believed that those conclusions would be mistaken and that other Contributor Panel banks were submitting unrealistically low Dollar LIBORs.  Those Barclays managers sought to avoid what they believed would be an inaccurate perception that Barclays

17

was not in good financial shape when compared to its peers. Thus, Barclays engaged in this

misconduct in order to reduce the reputational risk associated with proper, higher LIBOR

submissions. In other words, as Barclays employees stated in internal communications, the

purpose of the strategy of under-reporting Dollar LIBORs was to keep Barclays's "head below

the parapet" so that it did not get "shot" off.

41. As stated above, the intent of the Barclays managers who gave the instruction and

the submitters who contributed improperly low rate submissions in response to the instruction

was to influence Barclays's benchmark interest rate submissions, not the resulting fixes. On

some occasions, however, the manipulation of Barclays's submissions affected the fixed rates.

42. During approximately November 2007 through approximately October 2008, certain

employees at Barclays sometimes raised concerns with individuals at the BBA, the Financial

Services Authority, the Bank of England, and the Federal Reserve Bank of New York

concerning the diminished liquidity available in the market and their views that the Dollar

LIBOR fixes were too low and did not accurately reflect the market. In some of those

communications, those employees advised that all of the Contributor Panel banks, including

Barclays, were contributing rates that were too low. Those employees attempted to find a

solution that would allow Barclays to submit honest rates without standing out from other

members of the Contributor Panel, and they expressed the view that Barclays could achieve that

goal if other banks submitted honest rates. These communications, however, were not intended

and were not understood as disclosures through which Barclays self-reported misconduct to

authorities. Indeed, after the communications, Barclays continued improperly to take concerns

about negative publicity into account when making its submissions. Moreover, on other

18

occasions, those employees did not provide full and accurate information during their
conversations with these external parties.  Further, at least one occasion when Barclays's Dollar
LIBOR submissions were questioned by the media, Barclays responded that Barclays always
posted correct LIBORs.

      43.  As an example of one communication between a Barclays employee and a
representative of the BBA, on November 29, 2007, a Barclays manager ("Manager-1") contacted
a representative of the BBA ("BBA Representative-1") and said that s/he was "just talking off
the record" so that BBA Representative-1 would be "aware" of Dollar LIBORs.  Manager-1
stated that Dollar "LIBORs are being set lower than where they ought to be."  Manager-1
explained that Contributor Panel banks are submitting rates that are too low because "banks are
afraid to stick their heads above the parapet and post higher numbers because of what happened
to [Barclays] when [Barclays] did.  You get shot at."  Manager-1 explained his/her view that
Barclays was posting higher LIBORs than any other bank, and that other banks "are reluctant to
post higher and because no one will get out of the pack, the pack sort of stays low."  Manager-1
named certain other banks that s/he believed were submitting 1-month Dollar LIBORs lower
than where those banks could get funds.  Manager-1 encouraged BBA Representative-1 to send a
letter to the Contributor Panel about the importance of setting LIBORs at the correct levels.

      44.  As another example of a communication between Barclays and the BBA, on June 10,
2008,  the BBA issued a request for consultation to Contributor Panel banks in light of the
diminished liquidity during the financial crisis and news articles questioning the accuracy of
LIBOR.  The BBA noted suggestions that contributor banks may be exhibiting "herd" behavior
in their submitted rates to avoid "speculation and rumour mongering."  Manager-1 formally

responded to the request for consultation on behalf of Barclays to BBA Representative-1 but did

not disclose Barclays's management directive to submit lower LIBORs in order to avoid

negative media attention, which directive had resulted in improperly low LIBOR submissions.

In an August 5, 2008 report, the BBA concluded that contributing banks that responded to the

BBA's request for consultation were confident that their submitted rates were "truly reflective of

their perceived borrowing costs."

      45. A series of communications in late November and early December 2007 provide

examples of Barclays's communications with the FSA about its LIBOR submissions.  On

approximately November 30, 2007, a discussion occurred between a representative of Barclays

and the FSA; a few days later, one Barclays manager informed another manager that during the

discussion with the FSA: "We didn't say anything along the lines of, you know, we're not

posting where we think we should, I just talked about dislocations, Libors, liquidity premium,

and kept it simple, shall we say."   On December 4, 2007, a Barclays LIBOR submitter sent an

internal e-mail raising concerns about the Dollar LIBOR rates submitted by Contributor Panel

banks, including Barclays.  That submitter stated that s/he was submitting 1-month Dollar

LIBOR lower than s/he was paying, and lower than s/he would have set if "given a free hand."

That submitter stated that s/he was worried that the Contributor Panel banks' submissions,

including Barclays's, were false and dishonest.  On December 5, 2007, certain members of

Barclays senior management and a senior Barclays compliance manager decided to raise the

issue of LIBOR submissions with the FSA again.  The next day, December 6, 2007, a senior

Barclays compliance manager contacted a representative of the FSA.  That compliance manager

expressed concern about other banks' LIBOR submissions.  The compliance manager did not

Barclays.  Barclays acknowledges that the participating employees intended, at least in part, to benefit Barclays through the actions described above.  Barclays acknowledges that due to the misconduct, Barclays, including the Barclays branch in New York, has been exposed to substantial financial risk, and as a result of the penalties imposed by this non-prosecution agreement and under agreements reached with other government authorities, has suffered actual financial loss.

# EXHIBIT 7

UNITED STATES OF AMERICA
**Before the**
COMMODITY FUTURES TRADING COMMISSION

|  |  |  |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| Barclays PLC, Barclays Bank PLC | ) | CFTC Docket No. 12 – 25 |
| and Barclays Capital Inc., | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

ORDER INSTITUTING PROCEEDINGS PURSUANT TO
SECTIONS 6(c) AND 6(d) OF THE COMMODITY EXCHANGE ACT, AS
AMENDED, MAKING FINDINGS AND IMPOSING REMEDIAL SANCTIONS

**I.**

The Commodity Futures Trading Commission ("Commission") has reason to believe that
Barclays PLC, Barclays Bank PLC ("Barclays Bank") and Barclays Capital Inc. ("Barclays
Capital") (collectively, "Respondents" or "Barclays") have violated Sections 6(c), 6(d) and
9(a)(2) of the Commodity Exchange Act (the "Act" or the "CEA"), 7 U.S.C. §§ 9, 13b and
13(a)(2) (2006).  Therefore, the Commission deems it appropriate and in the public interest that
public administrative proceedings be, and hereby are, instituted to determine whether
Respondents engaged in the violations set forth herein, and to determine whether any order shall
be issued imposing remedial sanctions.

**II.**

In anticipation of the institution of an administrative proceeding, Respondents have
submitted an Offer of Settlement ("Offer"), which the Commission has determined to accept.
Without admitting or denying the findings or conclusions herein, except to the extent
Respondents admit those findings in any related action against Barclays by, or any agreement
with, the Department of Justice or any other governmental agency or office, Respondents herein
consent to the entry and acknowledge service of this Order Instituting Proceedings Pursuant to
Sections 6(c) and 6(d) of the Commodity Exchange Act, as Amended, Making Findings and
Imposing Remedial Sanctions ("Order").[1]

---

[1]   Respondents consent to the entry of this Order and to the use of these findings in this proceeding and
in any other proceeding brought by the Commission or to which the Commission is a party; provided,
however, that Respondents do not consent to the use of the Offer, or the findings or conclusions in this
Order, as the sole basis for any other proceeding brought by the Commission, other than in a proceeding
in bankruptcy or to enforce the terms of this Order.  Nor do Respondents consent to the use of the Offer or
this Order, or the findings in this Order consented to in the Offer, by any other party in any other
proceeding.

# III.

The Commission finds the following:

### A.   Summary

Over a period of several years, commencing in at least 2005, Barclays PLC, Barclays Bank and Barclays Capital, by and through their agents, officers and employees located in at least New York, London and Tokyo, repeatedly attempted to manipulate and made false, misleading or knowingly inaccurate submissions concerning two global benchmark interest rates, the British Bankers' Association's ("BBA") London Interbank Offered Rate ("LIBOR") and the European Banking Federation's ("EBF") Euro Interbank Offered Rate ("Euribor").

LIBOR and Euribor are leading short-term interest rate benchmarks intended to reflect the costs of borrowing unsecured funds in certain interbank markets. LIBOR and Euribor are critical to financial markets worldwide. They are used to price a variety of global financial products, including U.S.-based swaps transactions and futures contracts, as well as home mortgages and commercial and personal consumer loans. According to the Bank for International Settlements ("BIS"), over-the-counter interest rate derivatives, such as swaps and Forward Rate Agreements ("FRAs"), comprised over $449 trillion in notional value at the end of 2009, and over $500 trillion in notional value at the end of 2011.

Barclays Bank was, and is, a member of the panel of banks that submits rates for the daily calculation and global publication of various currencies of LIBOR and Euribor. The rates submitted by panel banks should reflect or relate to the costs of borrowing unsecured funds in certain interbank markets.

Barclays' violative conduct involved multiple desks, traders, offices and currencies, including United States Dollar ("U.S. Dollar"), Sterling, Euro and Yen. The wrongful conduct spanned from at least 2005 through at least 2009, and at times occurred on an almost daily basis. Barclays' conduct included the following:

(1) During the period from at least mid-2005 through the fall of 2007, and sporadically thereafter into 2009, Barclays based its LIBOR submissions for U.S. Dollar (and at limited times other currencies) on the requests of Barclays' swaps traders, including former Barclays swaps traders, who were attempting to affect the official published LIBOR, in order to benefit Barclays' derivatives trading positions; those positions included swaps and futures trading positions; this same conduct occurred with respect to Barclays' Euribor submissions for the period of at least mid-2005 through mid-2009 (see pp. 3 – 4, 7 – 11, 13 – 15, infra);

(2) During the period from at least mid-2005 through at least mid-2008, certain Barclays Euro swaps traders, led by a former Barclays senior Euro swaps trader, coordinated with, and aided and abetted traders at certain other banks to influence the Euribor submissions of multiple banks, including Barclays, in order to affect

2

the official published Euribor, and thereby benefit their respective derivatives
trading positions (*see* pp. 3 – 4, 15 – 18, *infra*); and

(3) During the volatile, global market conditions of the financial crisis of late
August 2007 through early 2009 (the "financial crisis period"), Barclays lowered
its LIBOR submissions in order to manage what it believed were inaccurate and
negative public and media perceptions that Barclays had a liquidity problem
based in part on its high LIBOR submissions relative to the low submissions of
other panel banks that Barclays believed were too low given market conditions.
Pursuant to a directive by certain members of Barclays' senior management,
Barclays submitted lower rates for U.S. Dollar LIBOR, and at limited times Yen
and Sterling LIBOR, than what it had determined to be the appropriate rates
reflecting the costs of borrowing unsecured funds in the relevant markets (*see* pp.
4, 19 – 25, *infra*).

Barclays' lack of specific internal controls and procedures concerning its submission
processes for LIBOR and Euribor and overall inadequate supervision of trading desks allowed
this conduct to occur.

Specifically, during the period from at least mid-2005 through the fall of 2007, and
sporadically thereafter into 2009, interest rate swaps traders, primarily located in Barclays' New
York and London offices, regularly requested that the Barclays' employee(s) responsible for
determining and submitting Barclays' daily LIBORs and Euribors ("submitters") submit a
particular rate or adjust their submitted rates higher or lower in order to affect the daily, official
published LIBOR and Euribor. Barclays' swaps traders were improperly attempting to benefit
Barclays' derivatives trading positions and the profitability of their particular trading books and
desks. Barclays' swaps traders also facilitated former Barclays swaps traders' requests to alter
LIBOR or Euribor submissions by passing along the former traders' requests to the Barclays
LIBOR or Euribor submitters as if they were their own. The Barclays submitters routinely based
their LIBOR and Euribor submissions on the traders' requests in furtherance of the attempts to
manipulate LIBOR and Euribor. The majority of Barclays' violative conduct involved U.S.
Dollar LIBOR and Euribor, but also, at limited times, involved Yen and Sterling LIBOR
submissions.

In addition, during the period from at least mid-2005 through mid-2008, certain Barclays
Euro swaps traders, led by a former Barclays senior Euro swaps trader, coordinated with and
aided and abetted traders at certain other banks in attempts to manipulate Euribor. The Barclays
swaps traders coordinated with traders at other banks on the rates to be submitted by their
respective Euribor submitters in order to benefit their bank's derivatives trading positions. These
Barclays Euro swaps traders agreed to ask, and did ask, the Barclays submitters for rates that
benefited the trading positions of the traders at the other banks. The Barclays swaps traders
made these requests as if they were their own requests and were to benefit Barclays' trading
positions. The submitters routinely accommodated those requests. The Barclays Euro swaps
traders also made similar requests to the traders at the other banks in order to benefit Barclays'
derivatives trading positions.

A bank's derivatives trading positions or profitability are not legitimate or permissible factors on which to base a bank's daily LIBOR and Euribor submissions. By basing its LIBOR and Euribor submissions on Barclays' derivatives traders' requests, and thereby on Barclays' derivatives trading positions, Barclays' LIBOR submissions were not consistent with the BBA's definitions and criteria for LIBOR submissions. Instead, Barclays conveyed false, misleading or knowingly inaccurate reports that its submitted rates for LIBOR and Euribor were based on and solely reflected the costs of borrowing unsecured funds in the relevant interbank markets. Accordingly, Barclays regularly attempted to manipulate and knowingly delivered, or caused to be delivered, false, misleading or knowingly inaccurate reports concerning U.S. Dollar LIBOR and Euribor, and at times, Yen and Sterling LIBOR, which are all commodities in interstate commerce.

During the financial crisis period, Barclays believed that the market and media inaccurately perceived Barclays as having liquidity problems in part because the rates submitted for LIBOR by Barclays were significantly higher at times than the rates submitted by other banks. Barclays contended the other banks' submissions were inappropriately low given the realities of the market conditions and lack of transactions occurring in the interbank markets. To manage public perceptions that its higher LIBOR submissions meant Barclays was a weaker institution, Barclays' senior management directed the Barclays submitters to lower Barclays' submissions in order to be closer to the rates submitted by the other banks, and thus, be a less noticeable outlier from the rest of the banks. The Barclays submitters complied with the management directive by submitting artificially lower rates than they would have otherwise submitted and that were inconsistent with the definition and criteria for submitting LIBOR. As a result, Barclays did not submit rates reflecting or relating to borrowing of unsecured funds in the relevant interbank markets.

The management directive impacted at least Barclays' U.S. Dollar LIBOR submissions in multiple maturities ("tenors") on a regular basis throughout the financial crisis period. The directive, on occasion, also impacted Barclays' Sterling and Yen LIBOR submissions. Concerns for one's reputation or negative market or press reports are not legitimate or permissible factors upon which a bank may base its daily LIBOR submissions. Accordingly, during the financial crisis period, Barclays, through its submissions, knowingly delivered, or caused to be delivered, false, misleading or knowingly inaccurate reports that affected or tended to affect LIBOR, a commodity in interstate commerce.[2]

***

In accepting Barclays' Offer, the Commission recognizes Respondents' significant cooperation during the Division of Enforcement's investigation of this matter, which included providing important information and analysis to the Division that helped the Division efficiently and effectively undertake its investigation.

---

[2]   While Barclays typically was one of the highest submitters of the LIBOR panel banks during the financial crisis period, Barclays' submissions, at times, were part of the calculation of the official published LIBOR. However, the Commission has not found evidence that Barclays lowered its LIBOR submissions in response to the management directive during the financial crisis period with the intent to affect the official published LIBOR.

**B.      Respondents**

**Barclays PLC** is a British banking and financial services company headquartered in the United Kingdom ("U.K."). It has operations in over 50 countries and territories including the United States.

**Barclays Bank PLC** is a global banking and financial services company based in the U.K. that is engaged in retail and commercial banking, credit cards, investment banking, wealth management and investment management services. It is wholly owned by Barclays PLC, and has offices in New York, New York.

**Barclays Capital Inc.** is a wholly owned subsidiary of Barclays PLC and engages in investment banking, wealth management and investment management services. It has been registered with the Commission as a Futures Commission Merchant since 1990, an approved Exempt Foreign Agent since 1992, and a Commodity Pool Operator and Commodity Trading Advisor since 2009. It maintains a business address and an active trading office in New York, New York.

**C.      Facts**

**1.      Barclays, Through the Acts of its Swaps Traders and Submitters, Made False LIBOR Reports and Attempted to Manipulate LIBOR**

**a.      LIBOR and the BBA Fixing of LIBOR**

The BBA is a U.K. trade association for the U.K. banking and financial services sector and is comprised of member banks. The BBA is not regulated. The BBA defines the term LIBOR and the criteria a panel bank is required to use in making its submissions, selects the banks for the LIBOR panels for each currency, and oversees the process of LIBOR submissions and publication of LIBOR. The BBA also enters into licensing agreements with third parties, including parties in the U.S., to allow dissemination of the LIBOR data. Thomson Reuters is the BBA's agent for the collection, calculation and publication of the daily LIBORs.

The BBA represents that LIBOR is intended to be a barometer to measure strain in money markets, that it often is a gauge of the market's expectation of future central bank interest rates, and that approximately $350 trillion of notional swaps and $10 trillion of loans are indexed to LIBOR. LIBOR also is the basis for settlement of interest rate futures and options contracts on many of the world's major futures and options exchanges, including the three-month and one-month Eurodollar contracts on the Chicago Mercantile Exchange ("CME"). Measured by the notional value of open interest, the CME Eurodollar contract is the most liquid and largest notional futures contract traded on the CME and in the world. The total traded volume of the CME Eurodollar contract had a notional value of over $437 trillion in 2009 and $564 trillion in 2011. It settles based on the three-month U.S. Dollar LIBOR published on the Monday before

the last trading day of the contract month.[3]  Moreover, LIBOR is fundamentally critical to financial markets and has an enormously widespread impact on global markets and consumers. LIBOR also affects businesses seeking credit, consumers obtaining mortgages or personal loans, and market participants transacting in numerous other financial contracts in the U.S. and abroad that are based on the benchmark interest rates.

Daily LIBORs are issued for ten currencies with fifteen tenors ranging from overnight through twelve months.  According to the BBA, LIBOR "is based on offered inter-bank deposit rates contributed in accordance with the Instructions to BBA LIBOR Contributor banks."  The BBA requires that "[a]n individual BBA LIBOR Contributor Panel Bank will contribute the rate at which it could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size just prior to [11:00 a.m. London time]."[4]  By its definition, LIBOR requires the submitting panel banks to determine the rates at which they can obtain funds in the London interbank market.  The definition of LIBOR does not permit consideration of factors unrelated to the costs of borrowing unsecured funds.

Every business day shortly before 11:00 a.m. London time, the banks on the LIBOR panels submit their rates to Thomson Reuters.  On behalf of the BBA, Thomson Reuters compiles a day's LIBOR for each currency and tenor by excluding the top and bottom quartile of rates and averaging the remaining eight rates.  That average rate becomes the official BBA daily LIBOR (the "LIBOR fixing").  The BBA then makes public the daily LIBOR fixing for each currency and tenor, as well as the daily submissions of each panel bank, through Thomson Reuters and the other data vendors licensed by the BBA.  This information is made available and relied upon throughout the world, including in the United States.

**b.     Barclays' Money Market Desk and its LIBOR Submission Process**

Barclays Bank is a member of the BBA and is one of the panel banks that submit rates for the determination of LIBOR for U.S. Dollar, Sterling, Euro, Yen and other currencies.[5]  During the times relevant herein, a Barclays Bank employee sat on the Steering Committee and Foreign Currency and Money Market ("FX & MM") Committee of the BBA.  The FX & MM Committee has responsibility for the operations and management of LIBOR.  The Steering Committee was responsible for the annual review of the LIBOR definition and of the contributors to the BBA LIBOR panels to determine whether they were still appropriate to remain on the panels.

---

[3]    The CME has a licensing agreement with the BBA that "permits the [CME] to use BBA LIBOR as the basis for settling Three–Month Eurodollar futures contracts and to refer to BBA LIBOR in connection with creating, marketing, trading, clearing, settling and promoting Three–Month Eurodollar futures contracts." CME Rulebook, Chapter 452, Three-Month Eurodollar Futures.  The CME also has the same licensing agreement to use BBA LIBOR as the basis for settling CME one-month Eurodollar contracts.

[4]    This definition of LIBOR has been used by the BBA from 1998 to the present.  In June 2008, in the wake of press questioning the underpinnings of LIBOR, the BBA provided additional information concerning the definition that it said provided more guidance.

[5]    Barclays Bank also was, and is, on the panels for making LIBOR submissions for Swiss franc, Canadian dollar, Australian dollar, Swedish krona and Danish krone.

Barclays Bank makes its daily submissions through Barclays' London Non-Sterling
Liquidity Management Desk (the "London Money Market Desk").  The primary responsibility of
the London Money Market Desk, and the LIBOR submitters on the desk, is to manage Barclays'
liquidity position and ensure that Barclays is fully funded each day in all currencies, including
U.S. Dollar.[6]  Until approximately the end of 2008, the London Money Market Desk maintained
its own trading book with profit and loss targets.

Throughout the periods relevant herein, Barclays regarded its senior and primary U.S.
Dollar LIBOR submitter as the expert on the U.S. Dollar money markets.  This submitter had
over 25 years of experience in the U.S. Dollar money markets and had been a long-standing
employee of Barclays.  He had been determining Barclays' daily U.S. Dollar LIBOR
submissions since 1995.[7]  Another money market trader assisted the senior U.S. Dollar LIBOR
submitter, and at times determined Barclays' U.S. Dollar LIBOR submissions.

Barclays' U.S. Dollar LIBOR submitters were the persons best situated to understand
Barclays' ability to borrow funds in the London interbank market, and therefore to determine the
appropriate U.S. Dollar LIBOR submissions to make on behalf of Barclays.

Barclays' U.S. Dollar LIBOR submitters based their daily submissions on certain market
information, including, but not limited to, the following: (1) cash transactions that had taken
place in the London U.S. Dollar money market and Barclays' ability to obtain funds in
reasonable size at those rates; (2) market information obtained from London interdealer brokers,
*i.e.*, voice brokers, overnight financial news, and/or internal Barclays research documents; (3)
central banks' decisions with respect to interest rates; (4) prior LIBOR submissions by Barclays
and other panel banks; and (5) expectations of Federal Open Market Committee decisions
regarding interest rates.  After considering these factors, the Barclays U.S. Dollar LIBOR
submitters determined a rate figure for each tenor and entered it into a spreadsheet for
submission.

Barclays did not have specific internal controls or procedures, written or otherwise,
regarding how LIBOR submissions should be determined or monitored.  Barclays also did not
require documentation of the submitters' LIBOR determinations.

**c.    Barclays Attempted to Manipulate LIBOR to Benefit Derivatives Trading
Positions**

From at least mid-2005 through the fall of 2007, and sporadically thereafter into 2009,
Barclays, through the acts of its swaps traders and submitters, attempted to manipulate U.S.

---

[6]    Because most of the LIBOR conduct at issue involves Barclays' U.S. Dollar LIBOR submissions, the
factual findings focus on U.S. Dollar LIBOR.  As noted, however, the Commission finds violative
conduct at limited times with respect to Barclays' Yen and Sterling LIBOR submissions.

[7]    Barclays' senior U.S. Dollar LIBOR submitter also had oversight responsibility for the submission of
Barclays' Yen LIBOR which was handled daily by other submitters.

Dollar LIBOR, and on occasion, Yen and Sterling LIBORs, for certain tenors. Barclays' attempts to manipulate U.S. Dollar LIBOR occurred at times on a daily basis.

Multiple interest rate swaps traders located in Barclays' New York, London and Tokyo offices asked Barclays' LIBOR submitters to make certain LIBOR submissions in order to affect the official BBA LIBOR fixings for certain tenors, thereby benefitting their respective derivatives trading positions and either increasing their profits or minimizing their losses.[8] The vast majority of these requests came from traders on Barclays' New York Interest Rate Swaps Desk ("NY Swaps Desk") located in New York and London and involved U.S. Dollar LIBOR.[9]

The NY Swaps Desk trades in a variety of products, including interest rate swaps,[10] FRAs, Treasury bonds, and Treasury futures, as well as the CME one-month and three-month Eurodollar futures and options contracts. The interest rate swaps traded by the NY Swaps Desk were generally tied to various tenors of U.S. Dollar LIBOR. Barclays acted as counterparty to clients in many interest rate swaps transactions. The derivatives instruments traded by the NY Swaps Desk were used to hedge the desk's interest rate risk and also to generate a profit for the desk.

Senior traders on the NY Swaps Desk instructed several other swaps traders to make the requests of the LIBOR submitters on Barclays' London Money Market Desk for certain LIBOR submissions in order to move their LIBOR submissions in a direction to benefit the desk's derivatives trading positions.[11] The traders' conduct was common and pervasive, and known by other traders and trading desk managers located near the interest rate swaps desk, both in New York and London. None of the traders attempted to conceal the requests from supervisors at Barclays during the entire period that the activity occurred. In fact, on occasion, the traders discussed their requests with trading desk managers.

The swaps traders made the requests in person, via email, and through electronic "chats" over an instant messaging system. On a few occasions, some swaps traders even made entries in electronic calendars to remind themselves what requests to make of Barclays' LIBOR submitters the next day. For a time, a trader sitting in London facilitated many of the requests on behalf of the New York swaps traders by forwarding the requests in person or by email to the submitters.

---

[8]   Prior to the financial crisis period, LIBOR generally was a stable rate with minute fluctuations. In addition, the range among the panel banks submissions was narrow, and panel banks frequently submitted the same rates.

[9]   There were several requests to alter Yen LIBOR from swaps traders in Barclays' Tokyo office and at least one request to alter Sterling LIBOR from a Barclays trader in Barclays' Singapore office.

[10]   An interest rate swap generally exchanges a fixed payment for a floating payment, wherein one party to a swap would pay a fixed rate and the other party to the swap would pay a floating rate, which is generally tied to three-month LIBOR.

[11]   Almost all of the traders involved in this conduct are no longer employed at Barclays.

The swaps traders expected that the LIBOR submitters would take their requests into account when determining their LIBOR submissions.[12]

Additionally, certain Barclays swaps traders received external requests to alter Barclays' U.S. Dollar LIBOR submissions from former Barclays swaps traders who had left Barclays and now were employed by other financial institutions. These former Barclays employees made the requests to benefit their derivatives trading positions, and expected that not only would these requests be forwarded to the LIBOR submitters, but that Barclays' LIBOR submitters would take their requests into account when making their LIBOR submissions. These requests were made typically by email or by instant message.

The swaps traders' requests, whether internal or external, typically concerned the one-month and three-month U.S. Dollar LIBOR submissions. The traders' requests also included either a specific rate to be submitted or the direction, higher or lower, that they wanted Barclays' LIBOR submission to move. Sometimes, the traders asked the submitters to try to have Barclays excluded ("kicked out" or "knocked out") from the LIBOR calculation by being in the top or bottom quartile, in an attempt to influence the official LIBOR fixing. Sometimes the requests covered several days or even weeks of submissions at a time.

The following are just some examples of the numerous trader requests over the years in question:

1) "WE HAVE TO GET KICKED OUT OF THE FIXINGS TOMORROW!! We need a 4.17 fix in 1m (low fix) We need a 4.41 fix in 3m (high fix)" (November 22, 2005, Senior Trader in New York to Trader in London);

2) "You need to take a close look at the reset ladder. We need 3M to stay low for the next 3 sets and then I think that we will be completely out of our 3M position. Then its on. [Submitter] has to go crazy with raising 3M Libor." (February 1, 2006, Trader in New York to Trader in London);

3) "Your annoying colleague again…Would love to get a high 1m Also if poss a low 3m … if poss… thanks" (February 3, 2006, Trader in London to Submitter);

4) "This is the [book's] risk. We need low 1M and 3M libor. Pls ask [submitter] to get 1M set to 82. That would help a lot" (March 27, 2006, Trader in New York to Trader in London);

5) "We have another big fixing tom[orrow] and with the market move I was hoping we could set the 1M and 3M Libors as high as possible" (May 31, 2006, Trader in New York to Submitter);

---

[12]   Appropriate daily supervision of the desk by the supervisors, as well as periodic review of the communications, should have discovered the conduct. However, Barclays lacked specific internal controls and procedures that would have enabled Barclays' management or compliance to discover this conduct.

6) "Hi Guys, We got a big position in 3m libor for the next 3 days. Can we please keep the libor fixing at 5.39 for the next few days. It would really help. We do not want it to fix any higher than that. Tks a lot." (September 13, 2006, Senior Trader in New York to Submitter);

7) "For Monday we are very long 3m cash here in NY and would like the setting to be set as low as possible... thanks" ( December 14, 2006, Trader in New York to Submitter); and

8) "Pls. go for 5.36 Libor again tomorrow, very long and would be hurt by a higher setting... thanks." (May 23, 2007, Trader in New York to Submitter).

The LIBOR submitters regularly considered the swaps traders' requests when determining and making Barclays' U.S. Dollar LIBOR submissions. To accommodate the swaps traders, the submitters moved Barclays' U.S. Dollar LIBOR submissions by one or more basis points in the direction requested by swaps traders, or submitted a specific rate depending on the particulars of the swaps traders' requests.

The submitters frequently responded affirmatively to the traders that they would accommodate the requests, often by saying "sure," "will do my best," or similar wording. In addition, the submitters in a couple of instances made entries in their own electronic calendars to remind themselves what rate to submit in order to accommodate a request made by swaps traders the previous day. Examples of the many instances where the submitters agreed to make the false submissions and attempted to manipulate the rate are:

1) "Am going 13. think market will go 12-12 ½." (November 14, 2005, Submitter's response to a swaps trader request for a very high one-month U.S. Dollar LIBOR submission, preferably a submission of "13+");

2) "[Senior Trader] owes me!" (February 7, 2006, Submitter's response when swaps trader called him a "superstar" for moving Barclays' U.S. Dollar LIBOR submission up a basis point more than the submitter wanted and for making a submission with the intent to get "kicked out");

3) "Going 58 [in 1 month] and 73 [in 3 month] and fully expecting to be knocked out." (February 8, 2006, Submitter's response to a swaps trader request for high one-month and three-month LIBOR submissions);

4) "For you ...anything. I am going to go 78 and 92.5. It is difficult to go lower than that in threes. looking at where cash is trading. In fact, if you did not want a low one I would have gone 93 at least." (March 16, 2006, Submitter's response to swaps trader's request for a high one-month and low three-month U.S. Dollar LIBOR );

5) "Always happy to help, leave it with me, Sir." (March 20, 2006, Submitter's response to a request);

6) "Done ... for you big boy..." (April 7, 2006, Submitter's response to swaps trader requests for low one-month and three-month U.S. Dollar LIBOR); and

10

7) "Set it at 5.345 against a consensus of 34."(March 5, 2007, Submitter's response to swaps trader request for high three-month U.S. Dollar LIBOR).

Barclays' submitters knew it was improper to consider swaps traders' derivatives trading positions in determining the bank's LIBOR submissions. A bank's financial derivatives trading positions are not legitimate or permissible factors on which to base a bank's daily LIBOR submissions. By basing its U.S. Dollar LIBOR submissions on Barclays' derivatives traders' requests, and thereby on Barclays' derivatives trading positions, Barclays' LIBOR submissions were not consistent with the BBA's definitions and criteria for LIBOR submissions. Instead, Barclays conveyed false, misleading or knowingly inaccurate reports that its submitted rates for LIBOR were based on and solely reflected its costs of borrowing unsecured funds in the London interbank money market. Accordingly, Barclays regularly attempted to manipulate and knowingly delivered false, misleading or knowingly inaccurate reports concerning U.S. Dollar LIBOR, and at times, Yen and Sterling LIBOR, which are all commodities in interstate commerce.[13]

## 2.   Barclays Attempted to Manipulate Euribor, Made False Euribor Reports and Coordinated with Other Banks in its Attempts to Manipulate Euribor

Barclays, through its swaps traders and submitters, also attempted to manipulate Euribor through internal requests by traders, which were accommodated by Barclays' submitters. The Euro swaps traders' at times coordinated their requests with swaps traders at certain other banks. The requests were made in order to benefit Barclays' derivatives trading positions and the derivatives trading positions of the other individual institutions involved.

### a.   Euribor and the EBF Fixing of Euribor

The EBF is an unregulated non-profit association of the European banking sector based in Brussels, Belgium. Among other functions, the EBF oversees the publication of Euribor, the predominant money market reference interest rate for the Euro currency. Euribor is used internationally in derivatives contracts, including interest rate swaps and futures contracts.[14] According to the BIS, over-the-counter interest rate derivatives, such as swaps and FRAs, comprised contracts worth over $175 trillion in notional value referenced to Euro rates at the end of 2009, and over $220 trillion in notional value at the end of 2011.

Euribor is defined as the rate "at which Euro interbank term deposits are offered by one prime bank to another prime bank" within the Economic and Monetary Union of the European Union ("EMU") at 11:00 a.m. Central European Time ("CET") daily. Euribor is determined using submissions from a panel of over 40 mostly European banks considered to be the most active in the Euro zone with the highest volume of business in the EMU. According to the EBF instructions, panel banks "must quote the required euro rates to the best of their knowledge."

---

[13]   As previously noted, there were some similar requests in this same period that the submitters make certain submissions involving Yen and Sterling LIBOR.

[14]   In October 2011, the CME launched the Euribor Futures contract, which settles based on the three-month Euribor.

The panel banks are to observe the market and base their submissions on where the Euro is trading in that market.  By its definition, Euribor requires the submitting panel banks to determine the rates at which funds may be obtained in the Euro interbank money market.  The definition of Euribor does not permit consideration of factors unrelated to the costs of borrowing unsecured funds.  Euribor is fixed every business day for fifteen tenors, ranging from one week to twelve months.

Like the BBA panel banks, the Euribor panel banks submit their rates electronically to Thomson Reuters, which manages the official Euribor process by collecting the submitted rates from the contributing banks, calculating the rate, and then releasing it for publication just before noon CET.  Thomson Reuters computes that day's published Euribor by eliminating the highest and lowest fifteen percent of submissions collected, and averaging the remaining submissions.  That average rate becomes the official daily EBF Euribor (the "Euribor fixing").  On behalf of EBF, Thomson Reuters then issues the Euribor fixing and the submissions of each panel bank to its subscribers and other data vendors.  Through these licensing agreements with third parties, such as Thomson Reuters, EBF disseminates the information throughout the world, including in the United States.

### b.    Barclays' Money Market Desk and its Euribor Submission Process

Barclays' London Money Market Desk was also responsible for Barclays Bank's daily Euribor submissions.  Throughout the periods relevant herein, Barclays regarded its primary and senior Euribor submitter as the expert on the Euro money markets.  Barclays' senior Euribor submitter had over 20 years of experience in the London money markets and had been with Barclays for over 35 years.  He had been determining Barclays' daily Euribor submissions since 1999.  Two other money market traders assisted the senior Euribor submitter and also determined Barclays' Euribor submissions.

Barclays' Euribor submitters were the persons best situated to understand Barclays' ability to borrow unsecured funds in the Euro interbank market, and therefore, to determine the costs, real and perceived, of borrowing unsecured funds and the appropriate Euribor submissions to make on behalf of Barclays Bank.

In determining their daily Euribor submission, Barclays' Euribor submitters considered Barclays' Euro transactions in the various tenors applicable to Euribor and information received from market intermediaries, such as voice brokers, indicating the prices at which the Euro was trading.  Barclays' Euribor submitters made their submission to Thomson Reuters shortly before 11:00 a.m. CET.

Barclays did not have specific internal controls or procedures, written or otherwise, regarding how Euribor submissions should be determined or monitored.  Barclays also did not require documentation of the submitters' Euribor determinations.

12

**c.**   **Barclays Swaps Traders Requested Certain Euribor Submissions to Benefit
Derivatives Trading Positions**

During the period from at least mid-2005 through mid-2009, Euro interest rate swaps
traders located in Barclays' London office made requests to Barclays' Euribor submitters for
higher or lower Euribor submissions with the purpose of affecting the official Euribor fixing.[15]
Certain of these traders, in particular one former senior Euro swaps trader, also regularly
contacted or were contacted by traders at certain other banks on the EBF Euribor panel to
coordinate the rates each trader would request of their own respective submitters. In making
these requests, the traders attempted to manipulate the official EBF Euribor fixings for various
tenors in order to benefit the traders' Euro derivatives trading positions and thereby increase
Barclays' profits or minimize its losses.

Barclays' Euro interest rate swaps desk was primarily responsible for trading Euro-
denominated interest rate swaps. The desk also traded EONIA[16]-based swaps, Euro-based
FRAs, and Euro-based futures and options. The traders held Euro-based interest rate swaps
positions generally tied to various tenors of the EBF Euribor. The traders hedged those positions
with other derivatives instruments. Just as the NY Swaps Desk benefitted from movements in
the LIBOR fixing, the traders' derivatives positions benefited if the official EBF Euribor fixing
moved in a certain direction depending on the characteristics of particular transactions. The
traders' derivatives positions were most affected by the Euribor fixing in the one-month, three-
month, and six-month tenors. These were the tenors in which the traders most frequently
requested a high or low submission by the Euribor submitters.

**i.**   **Improper Communications Between Barclays' Traders and Barclays'
Submitters**

Just as the NY Swaps Desk openly discussed requests to LIBOR submitters, Barclays'
Euro swaps traders' requests to Barclays' Euribor submitters to change their submissions to
benefit the traders' derivatives trading positions were an open, common and pervasive practice
on the desk. Multiple traders engaged in this conduct, and no attempt was made by any of the
traders to conceal the requests from supervisors at Barclays during the more than four-year
period in which the activity occurred.[17] In fact, traders would often shout across the trading desk
to fellow traders to confirm there were no conflicting requests before they sent their requests to
the Euribor submitters, and, on occasion, the traders discussed their requests with trading desk
managers.

---

[15]   The Euro swaps traders and Euribor submitters are different individuals than the U.S. Dollar swaps
traders and LIBOR submitters discussed above.

[16]   EONIA, or the Euro OverNight Index Average, is EBF's overnight reference rate for the Euro. It is a
weighted average of all overnight unsecured lending transactions undertaken by panel banks in the Euro
interbank market.

[17]   Appropriate daily supervision of the desk by the supervisors as well as periodic review of the
communications should have discovered the conduct. However, Barclays lacked specific internal controls
and procedures that would have enabled Barclays' management or compliance to discover this conduct.

13

After determining how moves in EBF Euribor would affect the desk's profitability, Barclays' Euro swaps traders contacted the Euribor submitters, including via email and through electronic "chats" over an instant messaging system, to request that the submissions be moved either higher or lower in a particular tenor.  On a few occasions, one swaps trader made entries in electronic calendars to remind himself what requests to make of Barclays' Euribor submitters the next day.

Barclays' Euribor submitters accommodated the requests, frequently expressly responding in the affirmative to the traders' requests.  The Euro swaps traders expected that the Euribor submitters would take their requests into account when determining their Euribor submissions.

Additionally, one former Barclays' senior Euro swaps trader on occasion sent requests to alter Barclays' Euribor submissions to his former fellow traders after he had left Barclays and was employed by other financial institutions.  He made the requests to benefit his derivatives trading positions.  These requests were made at a minimum by email or by instant message.

The following are just some of the numerous examples of the communications between the traders and submitters:

1) June 1, 2006:

   o  Senior Euro Swaps Trader: "Hi [Euribor Submitter], is it too late to ask for a low 3m?"

   o  Euribor Submitter: "Just about to put them in…..so no."

2) September 7, 2006:

   o  Senior Euro Swaps Trader: "i have a huge 1m fixing today and it would really help to have a low 1m tx a lot."

   o  Euribor Submitter: "I'll do my best."

   o  Senior Euro Swaps Trader: "because I am aware some other bank need a very high one….if you could push it very low it would help.  I have 50bn fixing."

3) October 13, 2006:

   o  Senior Euro Swaps Trader: "I have a huge fixing on Monday… something like 30bn 1m fixing… and I would like it to be very very very high….. Can you do something to help? I know a big clearer will be against us … and don't want to lose money on that one."

   o  Euribor Submitter forwarded the request to another Euribor submitter, advising: "We always try and do our best to help out….."

14

> o   Senior Euribor Submitter to Senior Euro Swaps Trader: "By the way [Euribor
>     Submitter] tells me that it would be good to see a high 1mth fix on Monday,
>     we will pay for some cash that morning so hopefully that will help."

4)  January 12, 2007:

> o   Senior Euro Swaps Trader: "hi [Euribor Submitter].  we need a low 1m in the
>     coming days if u can...."
>
> o   Senior Euribor Submitter: "hi [Senior Euro Swaps Trader], we will keep the
>     1mth low for a few days."

5)  April 2, 2007:

> o   Euro Swaps Trader: "hello [Senior Euribor Submitter], could you please put in a
>     high 6 month euribor today?"
>
> o   Senior Euribor Submitter: "will do."

6)  July 29, 2008:

> o   Euro Swaps Trader to Senior Euro Swaps Trader: "I was discussing the strategy
>     [to get a high fixing] with [Senior Euribor Submitter] earlier this morning - today
>     he will stay bid in the mkt and put a high fixing but without lifting any offer, and
>     then he will be really paying up for cash tomorrow and Thursday which is when
>     the big positive resets are."

**ii.    Barclays' Coordination and Communications with Certain Other
         Banks to Attempt to Manipulate Euribor**

During the period from at least mid-2005 through mid-2008, certain Barclays Euro swaps
traders, led by the same former Barclays' senior Euro swaps trader, coordinated with traders at
certain other panel banks to have their respective Euribor submitters make certain Euribor
submissions in order to affect the official EBF Euribor fixing.  These requests to and among the
traders were made to benefit the traders' respective derivatives trading positions and either
maximize their profits or minimize their losses.

The former Barclays senior Euro swaps trader, while still employed by Barclays, spoke
daily with traders at certain panel banks concerning their respective derivatives positions in order
to determine how to change the official EBF Euribor fixing in a manner that benefitted their
derivatives positions.[18]  In these conversations, the traders agreed to contact their respective
Euribor submitters to request the agreed-upon Euribor submission.  The Barclays senior Euro
swaps trader also received at times requests for certain Euribor submissions from traders at the
other banks, which he then made of the Barclays Euribor submitters as if the requests were his

---

[18]    When he was out of the office, the Barclays senior Euro swaps trader directed other traders on the
desk to contact the traders at the other banks on his behalf.

own, at times blind carbon copying the external trader on his emails to Barclays' Euribor
submitters.  By such conduct, the Barclays Euro Traders were attempting to manipulate Euribor
and aiding and abetting the attempts to manipulate Euribor by other banks.

The following are examples of the communications among the Barclays Senior Euro
Trader, Barclays' Euribor submitters and traders at other banks:

1) August 14, 2006:

   o   Trader at Bank A asked Barclays' Senior Euro Swaps Trader to request a low
       one month and high three month and six month Euribor.

   o   Barclays' Senior Euro Swaps Trader agreed to do so and promised to contact
       the trader at Bank B to make the same request.

   o   Barclays' Senior Euro Swaps Trader emailed the Barclays Senior Euribor
       Submitter: "We have some big fixings today. Is it possible to have a very low
       1m and high 3m and 6m? Thx a lot for your help."

   o   Barclays' Senior Euribor Submitter responded: "Sure, will do."

2) November 10, 2006:

   o   Trader at Bank A asked Barclays' Senior Euro Swaps Trader to request a low
       one month Euribor setting at Barclays and at Bank B.

   o   Barclays' Senior Euro Swaps Trader made the request of the trader at Bank B.

   o   Barclays' Senior Euro Swaps Trader emailed the request to the Barclays Senior
       Euribor Submitter: "hi [Senior Euribor Submitter]. I know you can help. On
       Monday we have a huge fixing on the 1m and we would like it to be low if
       possible. Tx for your kind help."

   o   Barclays' Senior Euribor Submitter replied: "of course we will put in a low
       fixing."

3) November 13, 2006:

   o   Barclays' Senior Euro Swaps Trader discussed the need for low one month
       Euribor with traders at Bank A and Bank B, and contacted a trader at Bank C.

   o   Barclays' Senior Euro Swaps Trader then reminded Barclays' Senior Euribor
       Submitter of his request from Friday: "hi [Senior Euribor Submitter]. Sorry to
       be a pain but just to remind you the importance of a low fixing for us today."

   o   Barclays' Senior Euribor Submitter replied: "no problem, I had not forgotton.
       The [voice] brokers are going for 3.372, we will put in 36 for our
       contribution;"

16

o   Barclays' Senior Euro Swaps Trader's responded: "I love you."

4)  December 5, 2006:

    o   Barclays' Senior Euro Swaps Trader requested that traders at Banks A, B and
        C have their Euribor submitters make a high six month Euribor submission.

    o   When the trader at Bank C stated that he needed the same submission,
        Barclays' Senior Euro Swaps Trader agreed to make the request of the
        Barclays Euribor submitters.

    o   Barclays' Senior Euro Swaps Trader emailed the Barclays Senior Euribor
        Submitter: "hi [Senior Euribor Submitter] is it possible to have a high 6m
        ficxing [sic]? Where do you think it will fix?"

    o   Barclays' Senior Euribor Submitter responded: "Hi [Senior Euro Swaps
        Trader]. we have posted 3.73, hope that helps..can put in higher if you like?"

    o   Barclays' Senior Euro Swaps Trader replied: "that's fine tx a lot for your
        help."

5)  February 12, 2007:

    o   Barclays' Senior Euro Swaps Trader agreed with traders at Banks A and B to
        have their respective one month Euribor submissions lowered.

    o   Barclays' Senior Euro Swaps Trader submitted that request to the Barclays
        Senior Euribor Submitter, stating: "hi [Senior Euribor Submitter]. Is it possible
        to have a low 1m fix today?"

    o   Barclays' Senior Euribor Submitter replied: "will do."

    In one instance of coordination over a four-month period, the Barclays senior Euro swaps
trader orchestrated an effort to align trading strategies among traders at multiple banks with the
goal of influencing the official EBF three-month Euribor fixing on the International Monetary
Market ("IMM") date[19] of March 19, 2007, in order to profit from their futures trading positions.
This scheme began at least in December 2006 and continued until the March 2007 IMM date.  It
involved multiple and successive requests over this period of time by the Barclays senior Euro
swaps trader to Barclays' Euribor submitters and traders at other banks to lower the three-month
Euribor submission on dates leading up to and including the March 2007 IMM date.  The
following are examples of the communications involved in this scheme:

---

[19]   IMM dates are standard quarterly settlement dates in March, June, September and December.  Many
derivatives contracts are settled or reset on these dates, including various Euribor futures contracts.

1) December 27, 2006:

   o   Barclays' Senior Euro Swaps Trader: "Hi [Barclays Euro Swaps Trader].  A few
       things. Ask for a low 3m today and ask [trader at Bank B] and [trader at Bank A]
       to put it low as well."

   o   Two days later, Barclays' Euro Swaps Trader emailed the Euribor requests as
       instructed to the Barclays Euribor Submitters and the traders at the other banks.

2) February 12, 2007:

   o   Barclays' Senior Euro Swaps Trader bragged to a trader at Bank D that he was
       going to "push the cash to the basement" on the next IMM March date in
       order to make money on trades, claiming that he will have 80,000 lots in the
       Euribor futures contract on it.  He swore the trader at Bank D to secrecy,
       claiming that if they did not keep the plan secret it would not work.  Barclays'
       Senior Euro Swaps Trader also claimed that his "treasury [or Euribor
       Submitter] has the power to move 3m cash to the basement."

3) March 19, 2007:

   o   Barclays' Senior Euro Swaps Trader emailed the Barclays Euribor submitter:
       "As discussed could …put the 3m as low as possible…."

   o   The Barclays Euribor Submitter replied: "Will do my best."

4) March 20, 2007:

   o   Barclays' Senior Euro Swaps Trader stated to trader at Bank A that they
       needed to have the three month Euribor fixing go up slowly to avoid drawing
       any attention.

   o   Barclays' Senior Euro Swaps Trader told the trader at Bank A that he believed
       he was able to influence five other panel member banks the day before to
       lower their Euribor submissions as they both desired.

Barclays' Euribor submitters knew it was improper to consider swaps traders' derivatives
trading positions in determining the bank's Euribor submissions.  A bank's financial derivatives
trading positions are not legitimate or permissible factors on which to base a bank's daily
Euribor submissions.  By basing its Euribor submissions upon Barclays' derivatives traders'
requests, and thereby on Barclays' derivatives trading positions, Barclays' Euribor submissions
were not consistent with the EBF's definitions and criteria for Euribor submissions.  Instead,
Barclays conveyed false, misleading or knowingly inaccurate reports that its submitted rates for
Euribor were based on and solely reflected the costs of borrowing unsecured funds in the Euro
money market.  Accordingly, Barclays regularly attempted to manipulate and knowingly
delivered false, misleading or knowingly inaccurate reports concerning Euribor, a commodity in
interstate commerce.

18

**3.      During the Financial Crisis, Barclays Senior Management Directed that LIBOR
Submissions Be Lowered**

During the financial crisis period, Barclays directed its U.S. Dollar LIBOR submitters to
lower their daily U.S. Dollar LIBOR submissions in order to protect Barclays' reputation against
what it believed were negative and unfair media and market perceptions that Barclays had a
liquidity problem based in part on its high LIBOR submissions.[20]

Beginning in August 2007, market conditions began to deteriorate significantly. At times
during the financial crisis period, there was severe illiquidity in the London interbank money
market, resulting in no interbank lending in certain tenors. Barclays' U.S. Dollar LIBOR
submitters continued to utilize the same factors, as described above, for determining LIBOR
submissions, but had substantially fewer transactions and offers to consider which made
determining Barclays' submissions more difficult. Prior to the financial crisis period, Barclays'
U.S. Dollar LIBOR submitters considered "reasonable size" for a transaction by Barclays in the
London U.S. Dollar money markets to be $250-$500 million. During the financial crisis period,
a reasonable sized transaction was significantly lower.

However, the LIBOR panel bank submitters were still required to adhere to the LIBOR
definition and criteria and submit rates based on their evaluation of the costs of borrowing
unsecured funds in the London interbank market.

In late August 2007, Barclays' senior U.S. Dollar LIBOR submitter began emailing
liquidity reports within Barclays, commenting about the money markets and other banks.
Initially, in these market reports, the senior U.S. Dollar LIBOR submitter expressed his belief
that in setting Barclays' submission higher relative to others, he was setting correctly and that a
number of banks were submitting rates that were "unrealistically low," particularly in a market
environment where banks were reluctant to lend money for longer than a one-month period. The
senior U.S. Dollar LIBOR submitter often acknowledged in these reports that his own U.S.
Dollar LIBOR submissions were not accurate, and were lower than where he thought the cost of
borrowing unsecured funds was for Barclays. He recognized, at times, that if he were to submit
higher, accurate LIBORs, then the market or press would report that Barclays was experiencing
difficulty in funding itself.

On September 3, 2007, Bloomberg featured Barclays in a news article entitled "Barclays
Takes a Money-Market Beating." The article speculated that Barclays may have been having
liquidity problems, because on two occasions Barclays had to borrow Sterling from the
emergency lending facility of the Bank of England,[21] and because of Barclays' relatively high
LIBOR submissions in Sterling, Euro and U.S. Dollar. The article posed the question, "So what
the hell is happening at Barclays and its Barclays Capital securities unit that is prompting its
peers to charge it premium interest in the money market?" Other newspapers, including the U.K.
Financial Times and the Standard, ran similar articles about LIBOR and Barclays.

---

[20]    At limited times this management directive also impacted submissions for Sterling and Yen LIBOR.

[21]    According to Barclays, Barclays had to borrow from the Bank of England due to operational errors
caused by other banks' late payments to Barclays.

On the day of the Bloomberg article, Barclays' U.S. Dollar LIBOR submissions in at least three tenors were the highest submissions of all panel banks, and were over six to nine basis points higher than the official BBA LIBOR fixing at those tenors. Barclays believed that its high LIBOR submissions caused its financial condition to be misperceived by the public and the media.

The negative media speculation caused significant concern within Barclays and was discussed among high levels of management within Barclays Bank. As a result, certain senior managers within Barclays Bank Treasury ("senior Barclays Treasury managers") instructed the U.S. Dollar LIBOR submitters and their supervisor to lower Barclays' LIBOR submissions, so that they were closer in range to the submitted rates by other banks but not so high as to attract media attention.

Senior Barclays Treasury managers coined the phrase "head above the parapet" to describe being an outlier on the U.S. Dollar LIBOR panel, which meant making high LIBOR submissions relative to the submitted rates of the other banks and attracting media attention. Senior Barclays Treasury managers directed Barclays' U.S. Dollar LIBOR submitters that their LIBOR submissions should not be at a level where Barclays was "sticking its head above the parapet," in order to avoid unwanted market and media attention for high LIBOR submissions that could potentially damage Barclays' reputation. Senior Barclays Treasury managers provided the submitters with the general guidance that Barclays' submitted rates should be within ten basis points of the submissions by the other U.S. Dollar panel banks to be in compliance with the directive.

Barclays knew that accounting for its reputational risk in its determination of LIBOR submissions was not permissible under BBA's definition and criteria. The submitters and their supervisor, however, understood that they were to follow this directive regardless of market conditions or whether their assessment of Barclays' cost of obtaining unsecured funds dictated their submissions to be otherwise. Barclays' U.S. Dollar LIBOR submitters knew that, by acting upon senior management's instruction to be below "the parapet," they were making improper U.S. Dollar LIBOR submissions that were management's rates and not the rates that the submitters had determined were the correct rates, *i.e.*, those that reflected Barclays' assessment of its cost of borrowing unsecured funds in the London interbank money market.

The senior Barclays Treasury managers frequently discussed with the U.S. Dollar LIBOR submitters and their supervisor the specific rates to be submitted, in order to ensure they were in compliance with the directive. In these discussions, the senior U.S. Dollar LIBOR submitter consistently made clear that they were not setting Barclays' submissions at the rates that reflected Barclays' cost of obtaining unsecured funds. These discussions were memorialized in multiple recorded telephone calls and emails during the more than 18-month financial crisis period.

For example, on November 28, 2007, Barclays' senior U.S. Dollar LIBOR submitter emailed a large group of Barclays' employees, including the senior Barclays Treasury managers, stating "LIBORs are not reflecting the true cost of money. I am going to set ..., probably at the

20

top of the range of rates set by libor contributors … [T]he true cost of money is anything from 5-15 basis points higher." A senior Barclays Treasury manager endorsed the submissions, replying "[f]ine on LIBOR settings - thanks for remaining pragmatic but at the upper end."

On November 29, 2007, the supervisor of the U.S. Dollar LIBOR submitters convened a telephone discussion with the senior Barclays Treasury managers and the U.S. Dollar LIBOR submitters. The supervisor said if the submitters submitted the rate for a particular tenor at 5.50, which was the rate they believed to be the appropriate submission, Barclays would be twenty basis points above "the pack" and "it's going to cause a shit storm." The supervisor asked that the issue be taken "upstairs," meaning that it should be discussed among more senior levels of Barclays' management. The most senior Barclays Treasury manager agreed that he would do so. For the LIBOR submission, the group decided to compromise by determining to set at the same level as another bank, a rate of 5.3, which was, again, not at the rate the submitters believed to be appropriate for Barclays.

In this November 29, 2007 conversation, the group also discussed their belief that other banks were submitting unrealistically low rates and speculated that other banks were basing submissions on derivatives' positions. The group agreed that their concerns should be raised to the BBA. One of the senior Barclays Treasury managers called a BBA representative and stated that he believed that LIBOR panel banks, including Barclays, were submitting rates that were too low because they were afraid to "stick their heads above the parapet," and that "no one will get out of the pack, the pack sort of stays low." He also relayed his belief that other panel banks relied too much on information from voice brokers to determine appropriate rates in the market, instead of making independent determinations for their own institutions. He encouraged the BBA to react and be heavy handed, suggesting the sanction that banks involved in such conduct be removed from the panel. In apparent response to Barclays' call, the BBA sent an email to the Steering Committee of the BBA, which is comprised of certain panel bank members including Barclays, requesting views on whether rates were artificially low and how to address this. The senior Barclays Treasury manager responded to the email consistent with his conversation with the BBA, noting his belief that "LIBORS are lower than market levels even given the lack of liquidity" and "[s]ome banks are getting close to looking like they are actively not recognizing the actual market levels." Barclays did not disclose at this time that it was lowering its LIBOR submissions pursuant to a management directive.

The following day, the same senior Barclays Treasury manager had another conversation with the senior U.S. Dollar LIBOR submitter, who was again seeking guidance on his submissions. In this conversation, the senior Barclays Treasury manager related his understanding that senior management had discussed the issue and directed them to continue to "stick within the bounds[,] so no head above [the] parapet." In other words, the concerns and objections of the submitters and supervisor as raised the day before were overruled. The senior Barclays Treasury manager also told the U.S. Dollar LIBOR submitter that they would have to deal with the settings, meaning how to make LIBOR submissions per this directive, on "a day-to-day basis."

In early December 2007, Barclays' senior U.S. Dollar LIBOR submitter again warned his supervisor that Barclays was not setting "honest" rates when making its LIBOR submissions.

The senior U.S. Dollar LIBOR submitter emailed his supervisor stating that he submitted Barclays' one month LIBOR at 5.30 percent, which was four basis points over the next highest submission and almost five basis points over the LIBOR fixing. However, this submitted rate was well below the 5.40 percent that Barclays was paying (*i.e.*, asking) to borrow funds in the market, and that "given a free hand [he] would have set around 5.45%." He continued, "My worry is that we (both Barclays and the contributor bank panel) are being seen to be contributing patently false rates. We are therefore being dishonest by definition and are at risk of damaging our reputation in the market and with the regulators. Can we discuss urgently please?" The supervisor directed these concerns to a senior compliance officer and a member of senior management of Barclays.

The Barclays senior compliance officer subsequently had a conversation with the U.K. Financial Services Authority ("FSA") in which LIBOR was discussed. The senior compliance officer stated in an internal email directed to several levels of Barclays' senior management that he informed FSA of the following: that Barclays believed that LIBOR submissions by the panel banks were distorted due to market illiquidity; that Barclays had been consistently the highest or one of the two highest submitters but was concerned to go higher given the negative media reporting about Barclays; that Barclays had concerns about the trillions of dollars of derivatives fixed off LIBOR; and that there were "problematic actions" by some banks. However, the Barclays' senior compliance officer did not inform the FSA that Barclays was making its LIBOR submissions based on considerations of negative market or press perceptions of Barclays or that its LIBOR submitters' assessments of the appropriate rates for submission were being altered to adhere to the directive to be below "the parapet." After this conversation, the same Barclays senior compliance officer did not follow up internally with the LIBOR submitters or their supervisor to confirm that Barclays was making its LIBOR submissions properly in accordance with the BBA's definition and criteria for LIBOR. Instead, the management directive remained in effect, and in fact, senior Barclays Treasury managers ensured that the U.S. Dollar LIBOR submitters continued to adhere to that directive.

For example, in early March 2008, the senior U.S. Dollar LIBOR submitter noted in a telephone call to a colleague that there was no money in the market and that he had submitted a rate for 12-month LIBOR that was several basis points lower than the rate at which he was willing to pay to borrow funds in the market, because he had been advised by senior management that he should not make his submission any higher. The senior U.S. Dollar LIBOR submitter commented that he was unable to find funds to borrow in the market even when paying (*i.e.*, asking) to borrow funds at a rate well above where he submitted his 12-month LIBOR. He remarked that the senior Barclays Treasury manager told him that he should "not be quite as aggressive" in his submissions, meaning his submissions were too high.

Throughout the financial crisis period, Barclays' employees, including the submitters, received routine surveillance telephone calls from staff members of the FSA, the Bank of England and the Federal Reserve Bank of New York. These conversations concerned the deepening global financial crisis and were to gauge the level of liquidity in the markets. These calls increased in frequency as the crisis worsened. In these calls, LIBOR was discussed as a measure of the severe illiquidity in the markets, and in that context, in some calls, Barclays' employees expressed their opinion that Barclays and other panel banks were submitting rates that

22

were too low given the market conditions.  However, in those conversations, the Barclays'
employees did not explain that Barclays was not determining its LIBOR submissions in
accordance with the BBA's definition and criteria for LIBOR but instead was making its
submissions in a manner to avoid negative market and media attention.

On April 16, 2008, the Wall Street Journal published an article questioning the integrity
of LIBOR, entitled "Libor Fog: Bankers Cast Doubt on Key Rate Amid Crisis."[22]  The article
speculated that panel member banks were making LIBOR submissions lower than what they
were actually paying for funds to prevent the market from concluding that the banks were
desperate for cash.  The Barclays senior U.S. Dollar LIBOR submitter in a telephone call to a
senior Barclays Treasury manager expressed concerns about the article and stated that he was
doing the same thing as other banks, by submitting at one level while paying (*i.e.*, asking to
borrow funds) at a higher level in the market.  He noted his prior LIBOR submissions were lower
than where he thought he could obtain funds.  He stated, "I would be paying ... [2.98] today and
I'm going to be setting my LIBOR at [2.74] and I'm as guilty as hell. ... I will go [2.74] unless
I'm given permission to go otherwise, but I would be prepared to pay [2.98]."  The senior
Barclays Treasury manager replied, "I'm happy for you to be at and around the top of the pack
but can we please not sort of be ten basis points above the next...?"  The U.S. Dollar LIBOR
submitter followed up with his supervisor, saying he thought there was a compliance issue, but
no internal action was taken to address his concerns.

At this time, a senior Barclays Treasury manager informed BBA in a telephone call that it
had not been reporting accurately, although he noted that Barclays was not the worst offender of
the panel bank members.  "We're clean, but we're dirty-clean, rather than clean-clean."  The
BBA representative responded, "no one's clean-clean."  The senior Barclays Treasury manager
replied "no, because of the very fact of what happened to us...We were clean ...the market...
reacted accordingly.  And that's why we stepped away again."  The senior Barclays Treasury
manager was referencing the market speculation about Barclays' high LIBOR submission in
early fall 2007.  The BBA representative indicated that he understood what happened to any
bank that moved against the trend of lower submissions.  The same senior Barclays Treasury
manager had a similar conversation with the FSA during a surveillance call regarding market
liquidity conditions.

Barclays did not explain in these calls that it was making its LIBOR submissions
pursuant to a management directive and not in accordance with the BBA's definition and criteria
or consistent with the costs of obtaining unsecured funds in the London interbank money market.
Furthermore, throughout the financial crisis period, Barclays continued to make its LIBOR
submissions pursuant to this management directive and regularly submitted rates artificially
lower than where it believed it could obtain funds.  At the same time, the senior U.S. Dollar
LIBOR submitter, in his regular market commentaries, continued to document the increasing
lack of transactions that could be meaningful to his LIBOR submissions, his own artificially low

---

[22]   In response to press inquiries after the Wall Street Journal article, individuals within Barclays
discussed internally how to respond and agreed to state that Barclays' LIBOR submissions reflected the
market stress and that Barclays "always quote[d] accurate and fair LIBORs."  Barclays did not disclose
that in fact it lowered its submissions to avoid negative media speculation.

LIBOR submissions, and his belief that the official BBA LIBOR fixing was too low for market conditions.[23]

Going into the last quarter of 2008, particularly after the failure of Lehman Brothers in September 2008, the financial crisis worsened and financial institutions faced increased concerns about liquidity and perceptions of financial viability. Barclays increasingly felt tremendous external pressures concerning how it was being perceived in the market and media, particularly due to its higher LIBOR submissions relative to the other panel banks. Barclays continued to believe that the other panel banks' LIBOR submissions were unrealistically low. Even though it maintained that its liquidity position was in fact strong, Barclays was increasingly worried about these market and media perceptions. At this time, the Bank of England had a conversation with a senior individual in Barclays, in which it raised questions about Barclays' liquidity position and its relatively high LIBOR submissions.[24]

In late October 2008, reacting to this pressure and the discussion with the Bank of England, Barclays believed it needed to lower its LIBOR submissions even further. As a result, a member of senior management conveyed an instruction to the LIBOR submitters, through their supervisor, that Barclays' U.S. Dollar and Sterling LIBOR submissions needed to be lowered to be "within the pack," meaning Barclays' LIBOR submissions were to be made at or around the same rate as the other panel banks. The same senior manager confirmed and reiterated this directive in a meeting with the supervisors and some of the submitters a few days later.

The LIBOR submitters complied with this additional directive and sent their supervisor emails confirming their reluctant acquiescence. The senior U.S. Dollar submitter emailed his supervisor, "following on from my conversation with you I will reluctantly, gradually and artificially get my libors in line with the rest of the contributors as requested. I disagree with this approach as you are well aware. I will be contributing rates which are nowhere near the clearing rates for unsecured cash and therefore will not be posting honest prices."[25]

---

[23]   In the wake of the Wall Street Journal article, in June 2008, the BBA conducted a review of the definition of LIBOR and the submission process. Barclays and other panel bank members actively participated in this review. In August 2008, the BBA published its findings from the review and concluded from the contributing panel banks' comments, including Barclays, that the contributing banks were confident that their submissions reflected the costs of borrowing in the London interbank money market, and that the existing process for LIBOR submissions was appropriate and should be retained without modification. Accordingly, the BBA merely provided "amplification" to the LIBOR definition. As noted above, despite its participation in this review, Barclays continued to follow the senior management instruction to lower LIBOR submissions artificially.

[24]   Throughout the financial crisis, in addition to the regulatory staff level surveillance calls noted above, the Bank of England had discussions with certain senior managers of Barclays about its funding and liquidity position and LIBOR. Barclays' high LIBOR submissions relative to other panel bank submissions, and whether such submissions were appropriate, were discussed at times in these conversations.

[25]   The senior LIBOR submitter for Sterling sent a similar email to the same supervisor and then forwarded it to a senior compliance officer of Barclays. A senior compliance officer responded that the submitters should set where they see it, follow BBA rules, and avoid potential action by the BBA. The

At or around the time of this further directive, central banks were taking several measures to ease the liquidity strains in the marketplace. As a result, market and media speculation receded and the directive had less impact on submissions. Nonetheless, the original management instruction from late 2007, to stay below "the parapet," was not rescinded throughout the remainder of the financial crisis period. In emails and other communications, Barclays' submitters continued to indicate into at least mid-2009 that they were still basing their submissions at levels to minimize market or press speculation about Barclays.

Throughout the financial crisis period, Barclays often submitted among the highest rates as compared to the submissions made by the other banks on the U.S. Dollar panel, and, at times, was excluded from the calculation of the daily official LIBOR fixing, because Barclays' submission was in the highest quartile. However, Barclays was also at times one of the middle averaged rates used in the calculation of the daily official LIBOR fixing.

Barclays' submitters knew that reputational concerns or negative market or press reports were not legitimate or permissible factors on which to base their daily LIBOR submissions. By determining Barclays' LIBOR submissions on such considerations during the financial crisis period, those submissions did not reflect or relate to the cost of borrowing unsecured funds in the relevant interbank markets. Yet, during this time, Barclays' submitters routinely made their Barclays' U.S. Dollar LIBOR submissions for multiple tenors, and at limited times their Sterling and Yen LIBOR submissions, in accordance with senior management's instructions, and not in accordance with the definition and criteria for LIBOR. Accordingly, Barclays, through its submissions, knowingly delivered, or caused to be delivered, LIBOR submissions that constituted false, misleading or knowingly inaccurate reports that affected or tended to affect LIBOR, which is a commodity in interstate commerce.

## IV.

## LEGAL DISCUSSION

**A. Barclays Made False, Misleading or Knowingly Inaccurate Reports Concerning the Costs of Borrowing Unsecured Funds in Violation of Section 9(a)(2) of the Act**

Section 9(a)(2) makes it unlawful for any person "knowingly to deliver or cause to be delivered for transmission through the mails or interstate commerce by telegraph, telephone, wireless, or other means of communication false or misleading or knowingly inaccurate reports concerning crop or market information or conditions that affect or tend to affect the price of any commodity in interstate commerce . . . ." 7 U.S.C. § 13(a)(2) (2006); *U.S. v. Brooks*, No. 09-20871, 2012 WL 1768061 (5th Cir. May 18, 2012); *United States v. Valencia*, 394 F.3d 352 (5th Cir. 2004); *see also CFTC v. Johnson*, 408 F. Supp. 259, 267 (S.D. Tex. 2005) (same).

---

senior compliance officer also stated he was unaware of any external pressure to reduce rates to join the pack, but he would raise it with senior management. He never did so.

On a daily basis, Barclays, through the transmission of an electronic spreadsheet to
Thomson Reuters, knowingly delivered or caused to be delivered its U.S. Dollar, Yen, and
Sterling LIBOR and Euribor submissions through the mails or interstate commerce. Barclays'
submissions were also caused to be delivered through the mails or interstate commerce through
the daily dissemination and publication globally, including into the U.S., of the panel banks'
submissions by Thomson Reuters on behalf of BBA and EBF, and other third party vendors.
The panel banks' submissions are used to determine the official published rates for LIBOR and
Euribor, which are calculated based on a trimmed average of the submissions (as described
above in Section III.C.1.a). Barclays' daily LIBOR and Euribor submissions contained market
information concerning the costs of borrowing unsecured funds in particular currencies and
tenors, the liquidity conditions and stress in the money markets, and Barclays' ability to borrow
funds in the particular markets. Such market information affects or tends to affect the prices of
commodities in interstate commerce, including the daily rates at which BBA U.S. Dollar, Yen
and Sterling LIBOR and EBF Euribor are fixed.

Throughout the periods relevant to the conduct described herein, Barclays' LIBOR
submissions for U.S. Dollar, Yen, and Sterling and Euribor submissions were false, misleading
or knowingly inaccurate because they were routinely based on impermissible factors such as (1)
the management directive to lower Barclays' submitted rates to manage market and media
perceptions of Barclays, and (2) the derivatives positions of swaps traders, and were not based on
the costs of borrowing unsecured funds in the pertinent markets, as required. By using these
impermissible factors in making its LIBOR and Euribor submissions and without disclosing that
it based its submissions on these impermissible factors, Barclays conveyed false, misleading or
knowingly inaccurate information that the rates it submitted were based on and related to the
costs of borrowing unsecured funds in the relevant markets and were truthful and reliable.
Moreover, Barclays' submitters knew that Barclays' LIBOR and Euribor submissions contained
false and misleading rates. By such conduct, Respondents violated Section 9(a)(2) of the Act, 7
U.S.C. § 13(a)(2) (2006).

**B.   Respondents Attempted to Manipulate LIBOR and Euribor**

Together, Sections 6(c), 6(d), and 9(a)(2) of the Act prohibit acts of attempted
manipulation. Section 9(a)(2) of the Act makes it unlawful for "[a]ny person to manipulate or
attempt to manipulate the price of any commodity in interstate commerce, or for future delivery
on or subject to the rules of any registered entity . . . ." 7 U.S.C. § 13(a)(2) (2006). Section 6(c)
of the Act authorizes the Commission to serve a complaint and provide for the imposition of,
among other things, civil monetary penalties and cease and desist orders if the Commission "has
reason to believe that any person ... has manipulated or attempted to manipulate the market price
of any commodity, in interstate commerce, or for future delivery on or subject to the rules of any
registered entity, ... or otherwise is violating or has violated any of the provisions of [the] Act . . .
." 7 U.S.C. § 9 (2006). Section 6(d) of the Act is substantially identical to section 6(c). *See* 7
U.S.C. § 13b (2006).

The following two elements are required to prove an attempted manipulation: (1) an
intent to affect the market price, and (2) an overt act in furtherance of that intent. *See In re
Hohenberg Bros. Co.* [1975-77 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 20,271, at 21,477

(CFTC Feb. 18, 1977); *CFTC v. Bradley*, 408 F. Supp. 2d 1214 (N.D. Okla. 2005). To prove the
intent element of attempted manipulation, it must be shown that Barclays "acted (or failed to act)
with the purpose or conscious object of causing or effecting a price or price trend in the market
that did not reflect the legitimate forces of supply and demand." *In re Indiana Farm Bureau
Coop. Ass'n*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,796, at 27,283
(CFTC Dec. 17, 1982). "[W]hile knowledge of relevant market conditions is probative of intent,
it is not necessary to prove that the accused knew to any particular degree of certainty that his
actions would create an artificial price. It is enough to present evidence from which it may
reasonably be inferred that the accused 'consciously desire[d] that result, whatever the likelihood
of that result happening from his conduct.' *See U.S. v. U.S. Gypsum Co*, 438 U.S. [442, 445
(1978)]." *Id.* A profit motive may also be evidence of intent, although profit motive is not a
necessary element of an attempted manipulation. *See In re DiPlacido* [2007-2009 Transfer
Binder] Comm. Fut. L. Rep. (CCH) ¶ 30,970, at 62,484 (CFTC Nov. 5, 2008) (citing *In re
Hohenberg Bros. Co.*, [1975-1977 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 21,478)),
*aff'd*, 364 Fed. Appx. 657, No. 08-5559-ag, 2009 WL 3326624 (2d Cir. 2009).

Here, as evidenced by the extensive communications among traders and submitters,
Barclays' traders and submitters each specifically intended to affect the price at which the daily
BBA LIBOR for U.S. Dollar, Sterling, and Yen (for particular tenors), and the EBF Euribor (for
particular tenors), all commodities in interstate commerce, would be fixed. Moreover, the
evidence reflects that the traders' motives were to try to affect the BBA LIBOR and EBF Euribor
fixings in order to benefit their derivatives trading positions or to benefit the derivatives trading
positions of traders at other banks, with whom they actively coordinated. The evidence also
shows that the submitters understood the traders' motives and acted with manipulative intent by
submitting false, misleading or knowingly inaccurate market information that purported to reflect
the costs of borrowing unsecured funds, but in reality, reflected the profit motive of the swaps
traders.

The Barclays traders' requests for certain rates to be submitted which would benefit their
derivatives trading positions or the derivatives trading positions of traders at other banks, and the
submitters making LIBOR and Euribor submissions reflecting the traders' requests, constitute
overt acts in furtherance of their intent to affect the BBA LIBOR and EBF Euribor fixings. By
doing so, Barclays engaged in repeated acts of attempted manipulation in violation of Sections
6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006).

## C.  Respondents Aided and Abetted the Attempts of Other Traders at Other Banks to Manipulate Euribor

Pursuant to Section 13(a) of the Act, Barclays aided and abetted the attempts of traders at
other banks to manipulate LIBOR and Euribor in violation of the CEA. 7 U.S.C. § 13c(a)
(2006). Liability as an aider and abettor requires proof that: (1) the CEA was violated, (2) the
aider and abettor had knowledge of the wrongdoing underlying the violation, and (3) the aider
and abettor intentionally assisted the primary wrongdoer. *See In re Sharokh Nikkhah*, [1999-
2000 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 28,129, at 49,888 n.28 (CFTC May 12,
2000). Although actual knowledge of the primary wrongdoer's conduct is required, knowledge
of the unlawfulness of such conduct is not necessarily required to be demonstrated. *See In re*

*Lincolnwood Commodities, Inc.*, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶
21,986, at 28,255 (CFTC Jan. 31, 1984). Knowing assistance can be inferred from the
surrounding facts and circumstances. *Id. See also In re Buckwalter*, [1990-1992 Transfer
Binder] Comm. Fut. L . Rep. (CCH) ¶ 24,995, at 37,686 (CFTC Jan. 25, 1991).

Through daily communications, certain Barclays swaps traders and the traders at the
other panel banks discussed LIBOR and Euribor rates that would benefit their banks' respective
derivatives trading positions. The traders at the other panel banks asked the Barclays swaps
traders to have the Barclays LIBOR and Euribor submitters submit a certain rate, or submit a rate
in a direction higher or lower, that would benefit the derivatives' positions of the traders at the
other panel banks. The Barclays swaps traders agreed and made the requests of the Barclays
LIBOR and Euribor submitters. The Barclays LIBOR and Euribor submitters made their LIBOR
and Euribor submissions based on the Barclays swaps traders' requests. Accordingly, by seeking
to affect the rate at which LIBOR and Euribor were fixed, traders at other banks attempted to
manipulate LIBOR and Euribor in violation of Sections 6(c), 6(d), and 9(a)(2) of the Act, 7
U.S.C. §§ 9, 13b, and 13(a)(2) (2006). Barclays' traders had knowledge of and intentionally
assisted the attempts of the traders at the other banks to manipulate the rate at which LIBOR and
Euribor were fixed. By such acts of the Barclays swaps traders, Barclays aided and abetted the
attempts of traders at other banks to manipulate LIBOR and Euribor in violation of Sections 6(c),
6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006).

### D.  Barclays PLC, Barclays Bank and Barclays Capital Are Liable for the Acts of their Agents

Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2
(2012) provide that the act, omission, or failure of any official, agent or other person acting for
any individual, association, partnership, corporation, or trust within the scope of his employment
or office shall be deemed the act, omission, or failure of such individual, association, partnership,
corporation or trust. Pursuant to Section 2(a)(1)(B) of the CEA and Commission Regulation 1.2,
strict liability is imposed on principals for the actions of their agents. *See, e.g., Rosenthal & Co.
v. CFTC,* 802 F.2d 963, 966 (7th Cir. 1986); *Dohmen-Ramirez & Wellington Advisory, Inc. v.
CFTC,* 837 F.2d 847, 857-58 (9th Cir. 1988).

Barclays Bank and Barclays Capital are liable for the acts, omissions and failures of the
traders, managers, and submitters who acted as their employees and/or agents in the conduct
described above. Barclays PLC, which wholly owns Barclays Bank and Barclays Capital, is
liable for the acts, omissions and failures of Barclays Bank and Barclays Capital with respect to
the conduct described above. Accordingly, Barclays PLC, Barclays Bank and Barclays Capital
violated Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006), as
set forth above.

## V.

## FINDINGS OF VIOLATIONS

Based on the foregoing, the Commission finds that Respondents violated Sections 6(c),
6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006).

## VI.

### OFFER OF SETTLEMENT

Respondents, without admitting or denying the findings or conclusions herein, except to the extent Respondents admit those findings in any related action against Barclays by, or any agreement with, the Department of Justice or any other governmental agency or office, have submitted the Offer in which they:

A.   Acknowledge receipt of service of this Order;

B.   Admit the jurisdiction of the Commission with respect to all matters set forth in this Order and for any action or proceeding brought or authorized by the Commission based on violation of or enforcement of this Order;

C.   Waive:

    1.   the filing and service of a complaint and notice of hearing;

    2.   a hearing;

    3.   all post-hearing procedures;

    4.   judicial review by any court;

    5.   any and all objections to the participation by any member of the Commission's staff in the Commission's consideration of the Offer;

    6.   any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2006) and 28 U.S.C. § 2412 (2006), and/or the rules promulgated by the Commission in conformity therewith, Part 148 of the Commission's Regulations, 17 C.F.R. §§ 148.1-30 (2012), relating to, or arising from, this proceeding;

    7.   any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253, 110 Stat. 847, 857-868 (1996), as amended by Pub. L. No. 110-28, § 8302, 121 Stat. 112, 204-205 (2007), relating to, or arising from, this proceeding; and

    8.   any claims of Double Jeopardy based on the institution of this proceeding or the entry in this proceeding of any order imposing a civil monetary penalty or any other relief;

D.   Stipulate that the record basis on which this Order is entered shall consist solely of the findings contained in this Order to which Respondents have consented in the Offer; and

E.   Consent, solely on the basis of the Offer, to the Commission's entry of this Order that:

1.  makes findings by the Commission that Respondents violated Section 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006);

2.  orders Respondents to cease and desist from violating Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006);

3.  orders Respondents, jointly and severally, to pay a civil monetary penalty in the amount of $200,000,000, plus post-judgment interest; and

4.  orders Respondents and their successors and assigns to comply with the conditions and undertakings consented to in the Offer and as set forth in Part VII of this Order.

Upon consideration, the Commission has determined to accept the Offer.

## VII.

## ORDER

**Accordingly, IT IS HEREBY ORDERED THAT:**

A.  Respondents shall cease and desist from violating Sections 6(c), 6(d), and 9(a)(2) of the Act, 7 U.S.C. §§ 9, 13b, and 13(a)(2) (2006) of the Act.

B.  Respondents, jointly and severally, shall pay a civil monetary penalty of $200 Million Dollars ($200,000,000), within ten (10) days of the date of entry of this Order (the "CMP Obligation"). If the CMP Obligation is not paid in full within ten (10) days of the date of entry of this Order, then post judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Order pursuant to 28 U.S.C. § 1961 (2006). Respondents shall pay the CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

Commodity Futures Trading Commission
Division of Enforcement
ATTN: Accounts Receivables --- AMZ 340
E-mail Box: 9-AMC-AMZ-AR-CFTC
DOT/FAA/MMAC
6500 S. MacArthur Blvd.
Oklahoma City, OK 73169
Telephone: (405) 954-5644

If payment is to be made by electronic funds transfer, Respondents shall contact Linda Zurhorst or her successor at the above address to receive payment instructions and shall fully comply with those instructions.  Respondents shall accompany payment of the CMP Obligation with a cover letter that identifies the paying Respondent and the name and docket number of this proceeding.  The paying Respondent shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, D.C. 20581.

C.     Respondents and their successors and assigns shall comply with the following conditions and undertakings set forth in the Offer:

    1.  PRINCIPLES[26]

        i.  Barclays agrees to undertake the following: (1) to ensure the integrity and reliability of its Benchmark Interest Rate Submission(s), presently and in the future; and (2) to identify, construct and promote effective methodologies and processes of setting Benchmark Interest Rates, in coordination with efforts by Benchmark Publishers, in order to ensure the integrity and reliability of Benchmark Interest Rates in the future.

       ii.  Barclays represents and undertakes that each Benchmark Interest Rate Submission by Barclays shall be based upon a rigorous and honest assessment of information, and shall not be influenced by internal or external conflicts of interest, or other factors or information extraneous to any rules applicable to the setting of a Benchmark Interest Rate.

---

[26]   The following terms are defined as follows:

**Benchmark Interest Rate**:  An interest rate for a currency and maturity/tenor that is calculated based on data received from market participants and published to the market on a regular, periodic basis, such as LIBOR and Euribor;

**Benchmark Publisher**:  A banking association or other entity that is responsible for or oversees the calculation and publication of a Benchmark Interest Rate;

**Submission(s)**:  The interest rate(s) submitted for each currency and maturity/tenor to a Benchmark Publisher.  For example, if Barclays submits a rate for one month and three month U.S. Dollar LIBOR, that would constitute two Submissions;

**Submitter(s)**:  The person(s) responsible for determining and/or transmitting the Submission(s); and

**Supervisor(s)**:  The person(s) immediately and directly responsible for supervising any portion of the process of Submission(s) and/or any of the Submitter(s).

2.   INTEGRITY AND RELIABILITY OF BENCHMARK INTEREST RATE
SUBMISSIONS

    i.   <u>DETERMINATION OF SUBMISSIONS</u>:  Barclays shall determine its
Submission(s) based on the following Factors, Adjustments and
Considerations, unless otherwise prohibited by or contrary to an
affirmative obligation imposed by any law or regulation, or the rules or
definitions issued by a Benchmark Publisher.  Barclays' transactions shall
be given the greatest weight in determining its Submissions, subject to
applying appropriate Adjustments and Considerations in order to reflect
the market measured by the Benchmark Interest Rate.[27]

Barclays shall determine its Submissions as described in these
Undertakings within fourteen (14) days of the entry of this Order.

- Factor 1 — Barclays' Borrowing or Lending Transactions
Observed by Barclays' Submitters:

    a.   Barclays' transactions in the market as defined by the
Benchmark Publisher for the particular Benchmark Interest
Rate;

    b.   Barclays' transactions in other markets for unsecured
funds, including, but not limited to, certificates of deposit
and issuances of commercial paper; and

    c.   Barclays' transactions in various related markets, including,
but not limited to, Overnight Index Swaps, foreign currency
forwards, repurchase agreements, futures, and Fed Funds.

- Factor 2 — Third Party Transactions Observed by Barclays'
Submitters:

    a.   Transactions in the market as defined by the Benchmark
Interest Rate relevant to each of the Submission(s);

    b.   Transactions in other markets for unsecured funds,
including, but not limited to, certificates of deposit and
issuances of commercial paper; and

    c.   Transactions in various related markets, including, but not
limited to, Overnight Index Swaps, foreign currency
forwards, repurchase agreements, futures, and Fed Funds.

---

[27]   The rules used by Benchmark Publishers to determine Benchmark Interest Rates vary, may not be
consistent with each other, and provide different levels of guidance as to how to make Submissions.

- <u>Factor 3 — Third Party Offers Observed by Barclays' Submitters</u>:

  a. Third party offers to Barclays in the market as defined by the Benchmark Publisher relevant to each of the Submission(s);

  b. Third party offers in other markets for unsecured funds, including, but not limited to, certificates of deposit and issuances of commercial paper, provided to Barclays by interdealer brokers (*e.g.,* voice brokers); and

  c. Third party offers provided to Barclays in various related markets, including, but not limited to, Overnight Index Swaps, foreign currency forwards, repurchase agreements, and Fed Funds.

- <u>Adjustments and Considerations</u>:  All of the following Adjustments and Considerations may be applied with respect to each of the Factors above:

  a. <u>Time</u>:  With respect to the Factors considered above, proximity in time to the Submission(s) increases the relevance of that Factor;

  b. <u>Market Events</u>:  Barclays may adjust its Submission(s) based upon market events, including price variations in related markets, that occur prior to the time at which the Submission(s) must be made to the Benchmark Publisher. That adjustment shall reflect measurable effects on transacted rates, offers or bids;

  c. <u>Term Structure</u>:  As Barclays applies the above Factors, if Barclays has data for any maturity/tenor described by a Factor, then Barclays may interpolate or extrapolate the remaining maturities/tenors from the available data;

  d. <u>Credit Standards</u>:  As Barclays applies the above Factors, adjustments may be made to reflect Barclays' credit standing and/or the credit spread between the market as defined by the Benchmark Publisher and transactions or offers in the related markets used in the Factors above. Additionally, Barclays may take into account counterparties' credit standings, access to funds, and borrowing or lending requirements, and third party offers considered in connection with the above Factors; and

33

    e.   <u>Non-representative Transactions</u>: To the extent a
transaction included among the Factors above significantly
diverges in an objective manner from other transactions,
and that divergence is not due to market events as
addressed above, Barclays may exclude such transactions
from its determination of its Submission(s).

ii.   <u>SUPERVISOR(S) REVIEW</u>:  Effective within fourteen (14) days of the
entry of this Order, each daily Submission shall be reviewed by a
Supervisor on a daily basis after the Submission(s) are made to the
Benchmark Publisher.

iii.   <u>QUALIFICATIONS OF SUBMITTER(S) AND SUPERVISOR(S)</u>:  All
Submitter(s) shall have significant experience in the markets for the
Benchmark Interest Rate to which they are submitting or a comparable
market, but may designate less experienced parties, who routinely work
under their supervision, to make Submission(s) during limited periods of
absence.  All Supervisors shall have significant experience in the markets
for the relevant Benchmark Interest Rate or a comparable market.
Submitters, Supervisors and any parties designated to make Submission(s)
when the Submitter(s) are absent shall not be assigned to any derivatives
trading desk, unit or division within Barclays, or participate in derivatives
trading other than that associated with Barclays' liquidity and liability
management.  The compensation of Submitter(s) and Supervisor(s) also
shall not be directly based upon derivatives trading, other than that
associated with Barclays' liquidity and liability management.

iv.   <u>FIREWALLS: INTERNAL CONTROLS REGARDING IMPROPER
COMMUNICATIONS AND SUBMISSIONS</u>:  Barclays shall implement
internal controls and procedures to prevent improper communications with
Submitter(s) and Supervisor(s) regarding Submission(s) or prospective
Submission(s) to ensure the integrity and reliability of its Submission(s).
Such internal controls and procedures shall include, but not be limited to:

▪   The "firewalls" contemplated herein will be implemented through
written policies and procedures that delineate proper and improper
communications with Submitter(s) and Supervisor(s), whether
internal or external to Barclays.  For these purposes, improper
communications shall be any attempt to influence Barclays'
Submission(s) for the benefit of any derivatives trading position
(whether of Barclays or any third party) or any attempt to cause
Barclays' Submitter(s) to violate any applicable Benchmark
Publisher's rules or definitions, or Section 2 of these Undertakings;
and

- A requirement that the Submitter(s) shall not be located in close
  proximity to traders who primarily deal in derivatives products that
  reference a Benchmark Interest Rate to which Barclays contributes
  any Submission(s).  The two groups should be separated such that
  neither can hear the other.

v.  DOCUMENTATION:  Barclays shall provide the documents set forth
    below promptly and directly to the Commission upon request, without
    subpoena or other process, regardless of whether the records are held
    outside of the United States, to the extent permitted by law.

- For each Submission, Barclays shall contemporaneously
  memorialize, and retain in an easily accessible format for a period
  of five (5) years after the date of each Submission, the following
  information:

  a.  The Factors, Adjustments and Considerations described in
      Section 2(i) above that Barclays used to determine its
      Submission(s), including, but not limited to, identifying any
      non-representative transactions excluded from the
      determination of the Submission(s) and the basis for such
      exclusions, as well as identifying all transactions given the
      greatest weight or considered to be the most relevant, and
      the basis for such conclusion;

  b.  All models or other methods used in determining Barclays'
      Submission(s), such as models for credit standards and/or
      term structure, and any adjustments made to the
      Submission(s) based on such models or other methods;

  c.  Relevant data and information received from interdealer
      brokers used in connection with determining Barclays'
      Submission(s) including, but not limited to, the following:

      • Identification of the specific offers and bids relied
        upon by Barclays when determining each
        Submission; and

      • The name of each company and person from whom
        the information or data is obtained;

  d.  Barclays' assessment of "reasonable market size" for its
      Submission(s) (or any other such criteria for the relevancy
      of transactions to a Benchmark Interest Rate), to the extent
      that the rules for a Benchmark Interest Rate require that
      pertinent transactions considered in connection with

35

Submission(s) be of "reasonable market size" (or any other such criteria);

e.  Information regarding market events considered by Barclays in connection with determining its Submission(s), including, without limitation, the following:

- The specific market announcement(s) or event(s); and

- Any effect of such market event(s) on transacted rates, offers or bids in the relevant markets; and

f.  The identity of the Submitter(s) who made, and the Supervisor(s) who reviewed, the Submission(s).

▪ For each Submission, Barclays shall retain for a period of five (5) years after the date of each Submission, the following transactional data used by Barclays to determine its Submission(s); the data shall be easily accessible and convertible into the Microsoft Excel file format; the data shall include, without limitation, the following to the extent known to Barclays at the time of the Submission(s):

a.  Instrument;
b.  Maturity/tenor;
c.  Trade type (*i.e.*, loan/deposit, placing/taking);
d.  Buy/sell indicator;
e.  Transaction date (in mmddyyyy format);
f.  Maturity date (in mmddyyyy format);
g.  Value date (in mmddyyyy format);
h.  Loan effective date;
i.  Customer number;
j.  Currency;
k.  Ticket ID;
l.  Timestamp;
m.  Counterparty A (buyer/bidder);
n.  Counterparty B (seller/offeror);
o.  Nominal/notional size of the transaction;
p.  Interest basis (360/365 day year);
q.  The fixed interest rate; and
r.  Any special or additional terms (*e.g.*, a repurchase agreement or some form of "non-vanilla agreement").

▪ Transaction Records:  Barclays shall retain for a period of five (5) years trade transaction records and daily position and risk reports, including (without limitation) monthly and quarterly position and

risk reports, related to the trading activities of Submitter(s) and traders who primarily deal in derivatives products that reference a Benchmark Interest Rate; the records and reports shall be easily accessible and convertible into the Microsoft Excel file format.

- <u>Requirement To Record Communications</u>: Barclays shall record and retain to the greatest extent practicable all of the following communications:

  a. All communications concerning the determination and review of the Submission(s); and

  b. All communications of traders who primarily deal in derivatives products that reference a Benchmark Interest Rate concerning trades, transactions, prices, or trading strategies pertaining to any derivative that references any Benchmark Interest Rate (or the supervision thereof).

The above communications shall not be conducted in a manner to prevent Barclays from recording such communications;

Audio communications of Submitters and Supervisors shall be retained for a period of one (1) year. Audio communications of traders who primarily deal in derivatives products that reference a Benchmark Interest Rate, and who are located in the London, Tokyo, and/or New York office of Barclays, shall be retained for a period of six (6) months. Subject to a reasonable time to implement, Barclays' audio retention requirements pursuant to these Undertakings shall commence within a reasonable period after the entry of this Order and shall continue for a period of five (5) years thereafter;

All communications except audio communications shall be retained for a period of five (5) years; and

Nothing in these Undertakings shall limit, restrict or narrow any obligations pursuant to the Act or the Commission's Regulations promulgated thereunder, including but not limited to Regulations 1.31 and 1.35, 17 C.F.R. §§ 1.31 and 1.35 (2012), in effect now or in the future.

vi.   <u>MONITORING AND AUDITING</u>:

- <u>Monitoring</u>: Barclays shall maintain or develop monitoring systems or electronic exception reporting systems that identify possible improper or unsubstantiated Submissions. Such reports will be reviewed on at least a weekly basis and if there is any

significant deviation or issues, the underlying documentation for
the Submission shall be reviewed to determine whether the
Submission is adequately substantiated.  If it is not substantiated,
Barclays shall notify its chief compliance officer(s) and the
Benchmark Publisher;

- <u>Periodic Audits</u>:  Starting six (6) months from the date of the entry
  of this Order, and continuing every six (6) months thereafter,
  unless an annual audit is scheduled at the same time, Barclays shall
  conduct internal audits of reasonable, random samples of its
  Submission(s), the factors and all other evidence documenting the
  basis for such Submission(s), and communications of the
  Submitter(s) in order to verify the integrity and reliability of the
  process for determining Submission(s); and

- <u>Annual Audits By Third Party Auditors</u>:  Starting one (1) year
  from the date of the entry of this Order, and continuing annually
  for four (4) additional years thereafter, Barclays shall retain an
  independent, third-party auditor to conduct an audit of its
  Submission(s) and the process for determining Submission(s),
  which shall include, without limitation, the following:

  a.  Reviewing communications of Submitter(s) and
      Supervisor(s);

  b.  Interviewing the Submitter(s) and Supervisor(s), to the
      extent they are still employed by Barclays;

  c.  Obtaining written verification from the Submitter(s) and
      Supervisor(s), to the extent they are still employed by
      Barclays, that the Submission(s) were consistent with this
      Order, the policies and procedures in place for making
      Barclays' Submission(s), and the definitions applicable to
      the Benchmark Interest Rate for which Barclays made
      Submission(s); and

  d.  A written audit report to be provided to Barclays and the
      Commission (with copies addressed to the Commission's
      Division of Enforcement (the "Division")).

vii.  <u>POLICIES, PROCEDURES AND CONTROLS</u>:  Within sixty (60) days
      of the entry of this Order, Barclays shall develop policies, procedures and
      controls to comply with each of the specific Undertakings set forth above
      with the goal of ensuring the integrity and reliability of its Submission(s).
      In addition, Barclays shall develop policies, procedures and controls to
      ensure the following:

38

- The supervision of the Submission process;

- That any violations of the Undertakings or any questionable,
  unusual or unlawful activity concerning Barclays' Submissions are
  reported to and investigated by Barclays' compliance or legal
  personnel and reported, as necessary, to authorities and the
  Benchmark Publishers;

- The periodic but routine review of electronic communications and
  audio recordings of or relating to the Submission Process;

- Not less than monthly, the periodic physical presence of
  compliance personnel on the trading floors of the Submitter(s)
  and/or traders who primarily deal in derivatives products that
  reference a Benchmark Interest Rate in connection with these
  Policies, Procedures and Controls;

- The handling of complaints concerning the accuracy or integrity of
  Barclays' Submission(s) including:

  a.  Memorializing all such complaints;

  b.  Review and follow-up by the chief compliance officer(s) or
      his designee of such complaints; and

- The reporting of material complaints to the Chief Executive
  Officer and Board of Directors, relevant self-regulatory
  organizations, the relevant Benchmark Publisher, the Commission,
  and/or other appropriate regulators.

viii.  TRAINING:  Barclays shall develop training programs for all employees
who are involved in its Submission(s), including, without limitation,
Submitters and Supervisors, and all traders who primarily deal in
derivatives products that reference a Benchmark Interest Rate.  Submitters
and Supervisors shall be provided with preliminary training regarding the
policies, and procedures and controls developed pursuant to Section 2(vii)
of these Undertakings.  By no later than March 29, 2013, all Submitters,
Supervisors, and traders who primarily deal in derivatives products that
reference a Benchmark Interest Rate shall be fully trained in the
application of these Undertakings to them, as set forth herein.  Thereafter,
such training will be provided promptly to employees newly assigned to
any of the above listed responsibilities, and again to all Submitters,
Supervisors and traders who primarily deal in derivatives products that
reference a Benchmark Interest Rate as part of Barclays' regular training
programs.  The training shall be based upon the individual's position and
responsibilities, and as appropriate, address the following topics:

- The Undertakings set forth herein;

- The process of making Submission(s);

- The impropriety of attempting to influence the determination of Barclays' Submission(s);

- The requirement to conduct all business related to Barclays' Submission(s) on Barclays' recorded telephone and electronic communications systems, and not on personal telephones or other electronic devices, as set forth in Section 2(v) of these Undertakings;

- The requirement to conduct certain business related to derivatives products that reference a Benchmark Interest Rate on Barclays' recorded telephone and electronic communications systems, and not on personal devices or systems, as set forth in Section 2(v) of these Undertakings;

- The policies and procedures developed and instituted pursuant to these Undertakings; and

- The employment and other potential consequences if employees act unlawfully or improperly in connection with Barclays' Submission(s) or process for determining Submission(s).

ix. REPORTS TO THE COMMISSION:

- Compliance with Undertakings:  Every four (4) months, starting 120 days from the entry of this Order, Barclays shall make interim reports to the Commission, through the Division, explaining its progress towards compliance with the Undertakings set forth herein.  Within 365 days of the entry of this Order, Barclays shall submit a report to the Commission, through the Division, explaining how it has complied with the Undertakings set forth herein.  The report shall attach copies of and describe the internal controls, policies and procedures that have been designed and implemented to satisfy the Undertakings.  The report shall contain a certification from a representative of Barclays' Executive Management, after consultation with Barclays' chief compliance officer(s), that Barclays has complied with the Undertakings set forth above, and that it has established policies, procedures and controls to satisfy the Undertakings set forth in the Order;

- Submitter(s), Supervisor(s), and Heads of Appropriate Trading Desks:  Within fourteen (14) days of the entry of this Order, or as soon as practicable thereafter, Barclays shall provide, meet with

40

and explain these Undertakings to all Submitters, Supervisors and
the head of each trading desk that primarily deals in derivatives
that reference a Benchmark Interest Rate.  Within that same time
frame, Barclays shall provide to the Commission, through the
Division, written or electronic affirmations signed by each
Submitter, Supervisor, and head of each trading desk that primarily
deals in derivatives that reference a Benchmark Interest Rate,
stating that he or she has received and read the Order and
Undertakings herein, and that he or she understands these
Undertakings to be effective immediately; and

- Disciplinary and Other Actions:  Barclays shall promptly report to
  the Commission, through the Division, all improper conduct
  related to any Submission(s) or the attempted manipulation or
  manipulation of a Benchmark Interest Rate, as well as any
  disciplinary action, or other law enforcement or regulatory action
  related thereto, unless *de minimis* or otherwise prohibited by
  applicable laws or regulations.

3. DEVELOPMENT OF RIGOROUS STANDARDS FOR BENCHMARK
   INTEREST RATES

To the extent Barclays is or remains a contributor to any Benchmark Interest Rate,
Barclays agrees to make its best efforts to participate in efforts by current and
future Benchmark Publishers, other price reporting entities and/or regulators to
ensure the reliability of Benchmark Interest Rates, and through its participation to
encourage the following:

i. METHODOLOGY:  Creating rigorous methodologies for the contributing
   panel members to formulate their Submissions.  The aim of such
   methodologies should be to result in a Benchmark Interest Rate that
   accurately reflects the rates at which transactions are occurring in the
   market being measured by that Benchmark Interest Rate;

ii. VERIFICATION:  Enforcing the use of those methodologies through an
    effective regime of documentation, monitoring, supervision and auditing,
    required by and performed by the Benchmark Publishers, and by the
    contributing panel members internally;

iii. INVESTIGATION:  Facilitating the reporting of complaints and concerns
     regarding the accuracy or integrity of Submissions to Benchmark Interest
     Rates or the published Benchmark Interest Rate, and investigating those
     complaints and concerns thoroughly;

iv. DISCIPLINE:  Taking appropriate action if, following a thorough
    confidential investigation, the Benchmark Publisher determines that a

41

complaint or concern regarding the accuracy or integrity of a Submission
or the published Benchmark Interest Rate has been substantiated;

v.   TRANSPARENCY:  Making regular reports to the public and the markets
of facts relevant to the integrity and reliability of each Benchmark Interest
Rate.  Such reports should include, but not be limited to, the following:

- At the time each Benchmark Interest Rate is published, the
Benchmark Publisher should display prominently whether each
rate is based entirely on transactions in the market the rate is
supposed to reflect, or whether it instead is based, in whole or in
part, on other data or information;

- The Benchmark Publisher also should make periodic reports
regarding the number and nature of complaints and concerns
received regarding the accuracy or integrity of Submissions or the
published Benchmark Interest Rate while maintaining the
anonymity of all those who have reported or are the subject of
complaints and concerns;

- The Benchmark Publisher should additionally make periodic
reports regarding the results of all investigations into such
complaints and concerns while maintaining the anonymity of all
those involved in investigations that have not yet been completed;
and

vi.   FORMULATION:  Periodically examining whether each Benchmark
Interest Rate accurately reflects the rate at which transactions are
occurring in the market being measured (using the statistical method
prescribed by that Benchmark Interest Rate), and evaluating whether the
definition and instructions should be revised, or the composition of the
panel changed;

Such examinations should include a rigorous mathematical comparison of
transactions in the relevant market with the published Benchmark Interest
Rate on the same day over a specified period, and a determination of
whether any differences are statistically or commercially significant.

Barclays shall report periodically, on at least a quarterly basis, to the Commission,
through the Division, either orally or in writing, on its participation in such
efforts, to the extent that such reporting is not otherwise prohibited by law or
regulations, by the rules issued by Benchmark Publishers, or by nondisclosure
agreements by and between Barclays and Benchmark Publishers.

**The provisions of this Order shall be effective as of this date.**

By the Commission.

David A. Stawick
Secretary of the Commission
Commodity Futures Trading Commission

Dated:   June 27, 2012

45

# EXHIBIT 8

# LIBOR Rates History:
# Historical LIBOR Rate Information

**Current LIBOR Rates | LIBOR Rates History | LIBOR Rates Chart | LIBOR News**
**Prime Rate | Current Prime Rate | Prime Rate History | Prime Rate Forecast | SITEMAP**
**Mortgage Refi | Balance Transfer | Prepaid Debit Cards | Life Insurance | LIBOR**
**Student Credit Cards | Prepaid Credit Cards | Business Credit Cards | Secured Credit Cards**
**Chart: U.S. Prime Rate vs. Fed Funds Target Rate vs. 1-Month LIBOR vs. 3-Month LIBOR**

**Click Here to Return to the LIBOR Homepage**

## A Complete and Comprehensive History
## of The Monthly London InterBank Offered Rates

## - Click Here for Last Month's LIBOR Rates -

**Limited-Time Offer!** Transfer Your Balance
0% Intro APR for 18 months
DISCOVER
Terms and Conditions
Apply Now ›

|  | 1-Month | 3-Month | 6-Month | 12-Month |
|---|---|---|---|---|
| September of 1989 | 9.063 | 9.125 | 9.063 | 9 |
| October of 1989 | 8.703 | 8.688 | 8.438 | 8.375 |
| November of 1989 | 8.813 | 8.5 | 8.313 | 8.25 |
| December of 1989 | 8.5 | 8.375 | 8.313 | 8.234 |
|  | 1-Month | 3-Month | 6-Month | 12-Month |
| January of 1990 | 8.313 | 8.375 | 8.438 | 8.625 |
| February of 1990 | 8.375 | 8.375 | 8.438 | 8.688 |
| March of 1990 | 8.375 | 8.500 | 8.688 | 8.938 |
| April of 1990 | 8.563 | 8.750 | 9 | 9.375 |
| May of 1990 | 8.313 | 8.375 | 8.5 | 8.75 |

| | | | | |
|---|---|---|---|---|
| June of 1990 | 8.328 | 8.375 | 8.438 | 8.5 |
| July of 1990 | 8.063 | 8.047 | 8.047 | 8.109 |
| August of 1990 | 8.125 | 8.188 | 8.188 | 8.313 |
| September of 1990 | 8.297 | 8.375 | 8.422 | 8.5 |
| October of 1990 | 7.938 | 8.063 | 8.063 | 8.063 |
| November of 1990 | 9.125 | 8.516 | 8.375 | 8.188 |
| December of 1990 | 7.641 | 7.578 | 7.563 | 7.563 |
| | **1-Month** | **3-Month** | **6-Month** | **12-Month** |
| January of 1991 | 6.969 | 7.125 | 7.125 | 7.313 |
| February of 1991 | 7.063 | 6.891 | 6.891 | 7.063 |
| March of 1991 | 6.328 | 6.375 | 6.531 | 7 |
| April of 1991 | 6.078 | 6.188 | 6.313 | 6.75 |
| May of 1991 | 5.953 | 6.063 | 6.188 | 6.625 |
| June of 1991 | 6.078 | 6.25 | 6.563 | 7 |
| July of 1991 | 5.953 | 6.063 | 6.313 | 6.625 |
| August of 1991 | 5.75 | 5.75 | 5.875 | 6 |
| September of 1991 | 5.5 | 5.688 | 5.688 | 5.813 |
| October of 1991 | 5.250 | 5.375 | 5.359 | 5.5 |
| November of 1991 | 4.813 | 5 | 4.938 | 5.063 |
| December of 1991 | 4.238 | 4.25 | 4.25 | 4.375 |
| | | | | |

|  | 1-Month | 3-Month | 6-Month | 12-Month |
|---|---|---|---|---|
| January of 1992 | 4.141 | 4.188 | 4.25 | 4.625 |
| February of 1992 | 4.25 | 4.25 | 4.375 | 4.75 |
| March of 1992 | 4.25 | 4.375 | 4.547 | 5.063 |
| April of 1992 | 3.969 | 4.078 | 4.266 | 4.703 |
| May of 1992 | 4.016 | 4.078 | 4.25 | 4.75 |
| June of 1992 | 3.922 | 3.953 | 4.125 | 4.375 |
| July of 1992 | 3.391 | 3.453 | 3.625 | 3.75 |
| August of 1992 | 3.500 | 3.516 | 3.625 | 3.75 |
| September of 1992 | 3.188 | 3.281 | 3.313 | 3.375 |
| October of 1992 | 3.281 | 3.625 | 3.641 | 3.938 |
| November of 1992 | 3.172 | 3.891 | 3.891 | 4.141 |
| December of 1992 | 3.344 | 3.453 | 3.641 | 4.078 |
|  | 1-Month | 3-Month | 6-Month | 12-Month |
| January of 1993 | 3.203 | 3.313 | 3.438 | 3.75 |
| February of 1993 | 3.203 | 3.219 | 3.328 | 3.578 |
| March of 1993 | 3.203 | 3.266 | 3.375 | 3.625 |
| April of 1993 | 3.141 | 3.203 | 3.313 | 3.563 |
| May of 1993 | 3.203 | 3.313 | 3.438 | 3.75 |
| June of 1993 | 3.203 | 3.328 | 3.563 | 3.781 |

| | | | | |
|---|---|---|---|---|
| July of 1993 | 3.188 | 3.313 | 3.563 | 3.781 |
| August of 1993 | 3.203 | 3.250 | 3.438 | 3.563 |
| September of 1993 | 3.188 | 3.375 | 3.375 | 3.531 |
| October of 1993 | 3.188 | 3.453 | 3.5 | 3.688 |
| November of 1993 | 3.578 | 3.5 | 3.516 | 3.781 |
| December of 1993 | 3.297 | 3.375 | 3.500 | 3.813 |
| | **1-Month** | **3-Month** | **6-Month** | **12-Month** |
| January of 1994 | 3.141 | 3.250 | 3.391 | 3.703 |
| February of 1994 | 3.594 | 3.75 | 4 | 4.344 |
| March of 1994 | 3.703 | 3.938 | 4.250 | 4.75 |
| April of 1994 | 3.938 | 4.250 | 4.625 | 5.25 |
| May of 1994 | 4.375 | 4.625 | 5 | 5.516 |
| June of 1994 | 4.563 | 4.875 | 5.25 | 5.828 |
| July of 1994 | 4.516 | 4.875 | 5.328 | 5.828 |
| August of 1994 | 4.875 | 5 | 5.328 | 5.813 |
| September of 1994 | 5 | 5.438 | 5.688 | 6.188 |
| October of 1994 | 5.078 | 5.688 | 6 | 6.563 |
| November of 1994 | 6 | 6.078 | 6.438 | 7.078 |
| December of 1994 | 5.984 | 6.5 | 7 | 7.75 |
| | **1-Month** | **3-Month** | **6-Month** | **12-Month** |

| | | | | |
|---|---|---|---|---|
| January of 1995 | 6.078 | 6.328 | 6.688 | 7.25 |
| February of 1995 | 6.125 | 6.25 | 6.438 | 6.75 |
| March of 1995 | 6.141 | 6.266 | 6.438 | 6.75 |
| April of 1995 | 6.079 | 6.188 | 6.313 | 6.563 |
| May of 1995 | 6.063 | 6.063 | 6.063 | 6.055 |
| June of 1995 | 6.079 | 6 | 5.875 | 5.766 |
| July of 1995 | 5.875 | 5.891 | 5.875 | 5.875 |
| August of 1995 | 5.907 | 5.907 | 5.938 | 5.954 |
| September of 1995 | 5.922 | 5.993 | 5.985 | 5.969 |
| October of 1995 | 5.844 | 6.008 | 5.954 | 5.883 |
| November of 1995 | 6.032 | 5.907 | 5.735 | 5.672 |
| December of 1995 | 5.735 | 5.657 | 5.563 | 5.454 |
| | **1-Month** | **3-Month** | **6-Month** | **12-Month** |
| January of 1996 | 5.469 | 5.438 | 5.336 | 5.196 |
| February of 1996 | 5.352 | 5.313 | 5.289 | 5.274 |
| March of 1996 | 5.454 | 5.493 | 5.516 | 5.704 |
| April of 1996 | 5.454 | 5.485 | 5.422 | 5.829 |
| May of 1996 | 5.446 | 5.516 | 5.641 | 5.977 |
| June of 1996 | 5.516 | 5.625 | 5.844 | 6.172 |
| July of 1996 | 5.493 | 5.704 | 5.922 | 6.243 |

| | | | | |
|---|---|---|---|---|
| August of 1996 | 5.43 | 5.539 | 5.743 | 6.055 |
| September of 1996 | 5.438 | 5.649 | 5.75 | 5.985 |
| October of 1996 | 5.375 | 5.516 | 5.579 | 5.719 |
| November of 1996 | 5.391 | 5.524 | 5.547 | 5.696 |
| December of 1996 | 5.547 | 5.586 | 5.618 | 5.789 |
| | **1-Month** | **3-Month** | **6-Month** | **12-Month** |
| January of 1997 | 5.461 | 5.594 | 5.711 | 5.954 |
| February of 1997 | 5.469 | 5.555 | 5.68 | 5.954 |
| March of 1997 | 5.719 | 5.805 | 5.961 | 6.282 |
| April of 1997 | 5.704 | 5.883 | 6.079 | 6.454 |
| May of 1997 | 5.711 | 5.829 | 6.008 | 6.289 |
| June of 1997 | 5.719 | 5.813 | 5.938 | 6.141 |
| July of 1997 | 5.641 | 5.735 | 5.892 | 5.977 |
| August of 1997 | 5.68 | 5.735 | 5.86 | 6.079 |
| September of 1997 | 5.672 | 5.782 | 5.852 | 6.008 |
| October of 1997 | 5.633 | 5.766 | 5.805 | 5.922 |
| November of 1997 | 5.766 | 6.016 | 6.039 | 6.11 |
| December of 1997 | 5.852 | 5.985 | 6.008 | 5.669 |
| | **1-Month** | **3-Month** | **6-Month** | **12-Month** |
| January of 1998 | 5.704 | 5.758 | 6.039 | 5.774 |

| | | | | |
|---|---|---|---|---|
| February of 1998 | 5.789 | 5.782 | 5.782 | 5.836 |
| March of 1998 | 5.719 | 5.758 | 5.797 | 5.914 |
| April of 1998 | 5.688 | 5.766 | 5.868 | 6.024 |
| May of 1998 | 5.696 | 5.735 | 5.805 | 5.93 |
| June of 1998 | 5.748 | 5.785 | 5.871 | 5.94 |
| July of 1998 | 5.696 | 5.758 | 5.822 | 5.897 |
| August of 1998 | 5.727 | 5.713 | 5.692 | 5.648 |
| September of 1998 | 5.4 | 5.422 | 5.359 | 5.186 |
| October of 1998 | 5.277 | 5.351 | 5.131 | 4.865 |
| November of 1998 | 5.048 | 5.377 | 5.28 | 5.244 |
| December of 1998 | 5.118 | 5.172 | 5.172 | 5.213 |
| | **1-Month** | **3-Month** | **6-Month** | **12-Month** |
| January of 1999 | 4.946 | 5.032 | 5.036 | 5.108 |
| February of 1999 | 5.003 | 5.065 | 5.168 | 5.405 |
| March of 1999 | 4.94 | 5.009 | 5.083 | 5.307 |
| April of 1999 | 4.902 | 4.993 | 5.075 | 5.303 |
| May of 1999 | 4.93 | 5.053 | 5.193 | 5.503 |
| June of 1999 | 5.223 | 5.355 | 5.633 | 5.803 |
| July of 1999 | 5.178 | 5.32 | 5.68 | 5.836 |
| August of 1999 | 5.370 | 5.505 | 5.913 | 6.023 |

| | | | | |
|---|---|---|---|---|
| September of 1999 | 5.396 | 6.083 | 5.974 | 6.053 |
| October of 1999 | 5.41 | 6.218 | 6.144 | 6.313 |
| November of 1999 | 6.503 | 6.122 | 6.063 | 6.261 |
| December of 1999 | 5.832 | 6.005 | 6.136 | 6.508 |
| | **1-Month** | **3-Month** | **6-Month** | **12-Month** |
| January of 2000 | 5.856 | 6.049 | 6.238 | 6.659 |
| February of 2000 | 5.907 | 6.104 | 6.328 | 6.76 |
| March of 2000 | 6.133 | 6.289 | 6.53 | 6.97 |
| April of 2000 | 6.197 | 6.393 | 6.614 | 6.964 |
| May of 2000 | 6.641 | 6.617 | 7.064 | 7.453 |
| June of 2000 | 6.649 | 6.778 | 7.014 | 7.214 |
| July of 2000 | 6.625 | 6.715 | 6.887 | 7.047 |
| August of 2000 | 6.628 | 6.684 | 6.831 | 6.978 |
| September of 2000 | 6.62 | 6.816 | 6.761 | 6.811 |
| October of 2000 | 6.621 | 6.755 | 6.721 | 6.725 |
| November of 2000 | 6.827 | 6.735 | 6.678 | 6.618 |
| December of 2000 | 6.565 | 6.403 | 6.208 | 5.997 |
| | **1-Month** | **3-Month** | **6-Month** | **12-Month** |
| January of 2001 | 5.622 | 5.518 | 5.361 | 5.284 |
| February of 2001 | 5.278 | 5.103 | 4.955 | 4.925 |

| | | | | |
|---|---|---|---|---|
| March of 2001 | 5.078 | 4.877 | 4.711 | 4.67 |
| April of 2001 | 4.435 | 4.312 | 4.231 | 4.33 |
| May of 2001 | 4.059 | 3.999 | 3.99 | 4.259 |
| June of 2001 | 3.835 | 3.791 | 3.827 | 4.055 |
| July of 2001 | 3.76 | 3.677 | 3.694 | 3.835 |
| August of 2001 | 3.584 | 3.487 | 3.479 | 3.6 |
| September of 2001 | 2.637 | 2.597 | 2.532 | 2.65 |
| October of 2001 | 2.321 | 2.232 | 2.173 | 2.311 |
| November of 2001 | 2.145 | 2.08 | 2.101 | 2.492 |
| December of 2001 | 1.876 | 1.883 | 1.983 | 2.445 |
| | **1-Month** | **3-Month** | **6-Month** | **12-Month** |
| January of 2002 | 1.829 | 1.862 | 1.989 | 2.42 |
| February of 2002 | 1.883 | 1.92 | 2.068 | 2.496 |
| March of 2002 | 1.88 | 2.031 | 2.332 | 3.006 |
| April of 2002 | 1.842 | 1.913 | 2.100 | 2.613 |
| May of 2002 | 1.844 | 1.896 | 2.09 | 2.634 |
| June of 2002 | 1.836 | 1.86 | 1.948 | 2.251 |
| July of 2002 | 1.818 | 1.823 | 1.863 | 2.07 |
| August of 2002 | 1.82 | 1.816 | 1.815 | 1.943 |
| September of 2002 | 1.819 | 1.806 | 1.751 | 1.813 |

| | 1-Month | 3-Month | 6-Month | 12-Month |
|---|---|---|---|---|
| October of 2002 | 1.741 | 1.702 | 1.618 | 1.664 |
| November of 2002 | 1.38 | 1.432 | 1.471 | 1.705 |
| December of 2002 | 1.382 | 1.383 | 1.383 | 1.447 |
| | **1-Month** | **3-Month** | **6-Month** | **12-Month** |
| January of 2003 | 1.339 | 1.348 | 1.353 | 1.477 |
| February of 2003 | 1.334 | 1.336 | 1.336 | 1.368 |
| March of 2003 | 1.306 | 1.288 | 1.262 | 1.34 |
| April of 2003 | 1.318 | 1.308 | 1.290 | 1.362 |
| May of 2003 | 1.3189 | 1.2782 | 1.2232 | 1.2214 |
| June of 2003 | 1.1232 | 1.1164 | 1.1239 | 1.2014 |
| July of 2003 | 1.1036 | 1.1176 | 1.1507 | 1.2789 |
| August of 2003 | 1.117 | 1.142 | 1.2098 | 1.4714 |
| September of 2003 | 1.1214 | 1.1598 | 1.1795 | 1.2857 |
| October of 2003 | 1.1201 | 1.1657 | 1.2207 | 1.4551 |
| November of 2003 | 1.1157 | 1.1701 | 1.2297 | 1.4867 |
| December of 2003 | 1.1195 | 1.157 | 1.2192 | 1.4582 |
| | **1-Month** | **3-Month** | **6-Month** | **12-Month** |
| January of 2004 | 1.0982 | 1.132 | 1.2107 | 1.4607 |
| February of 2004 | 1.0973 | 1.1251 | 1.2026 | 1.3645 |
| March of 2004 | 1.0914 | 1.1107 | 1.1595 | 1.3401 |

| | | | | |
|---|---|---|---|---|
| April of 2004 | 1.1007 | 1.1764 | 1.3682 | 1.8082 |
| May of 2004 | 1.1089 | 1.3082 | 1.5789 | 2.0764 |
| June of 2004 | 1.3582 | 1.6039 | 1.942 | 2.4682 |
| July of 2004 | 1.4929 | 1.6945 | 1.9857 | 2.4632 |
| August of 2004 | 1.6482 | 1.7901 | 1.9907 | 2.3001 |
| September of 2004 | 1.8401 | 2.0054 | 2.1695 | 2.4445 |
| October of 2004 | 1.987 | 2.1582 | 2.3007 | 2.5289 |
| November of 2004 | 2.2826 | 2.4026 | 2.6239 | 2.9607 |
| December of 2004 | 2.4178 | 2.5582 | 2.7751 | 3.1004 |
| | **1-Month** | **3-Month** | **6-Month** | **12-Month** |
| January of 2005 | 2.5892 | 2.7439 | 2.9582 | 3.271 |
| February of 2005 | 2.6895 | 2.9101 | 3.1495 | 3.5114 |
| March of 2005 | 2.8582 | 3.0995 | 3.3876 | 3.842 |
| April of 2005 | 3.0826 | 3.2107 | 3.4151 | 3.7101 |
| May of 2005 | 3.1126 | 3.3292 | 3.5314 | 3.7789 |
| June of 2005 | 3.3401 | 3.5045 | 3.6914 | 3.8632 |
| July of 2005 | 3.5107 | 3.6948 | 3.9235 | 4.1745 |
| August of 2005 | 3.6942 | 3.872 | 4.0817 | 4.3123 |
| September of 2005 | 3.8584 | 4.0551 | 4.2154 | 4.4067 |
| October of 2005 | 4.0882 | 4.2523 | 4.4467 | 4.6765 |

| | 1-Month | 3-Month | 6-Month | 12-Month |
|---|---|---|---|---|
| November of 2005 | 4.2954 | 4.4139 | 4.5795 | 4.7379 |
| December of 2005 | 4.3857 | 4.5298 | 4.6901 | 4.8226 |
| | **1-Month** | **3-Month** | **6-Month** | **12-Month** |
| January of 2006 | 4.572 | 4.6795 | 4.8126 | 4.9412 |
| February of 2006 | 4.631 | 4.8192 | 4.9907 | 5.1526 |
| March of 2006 | 4.826 | 4.9898 | 5.1196 | 5.2476 |
| April of 2006 | 5.0245 | 5.1479 | 5.2879 | 5.4217 |
| May of 2006 | 5.1071 | 5.2335 | 5.3215 | 5.4139 |
| June of 2006 | 5.3451 | 5.5085 | 5.6382 | 5.766 |
| July of 2006 | 5.4045 | 5.4889 | 5.5473 | 5.591 |
| August of 2006 | 5.3314 | 5.4014 | 5.4501 | 5.4501 |
| September of 2006 | 5.3229 | 5.3725 | 5.3704 | 5.2985 |
| October of 2006 | 5.3198 | 5.3729 | 5.3898 | 5.3348 |
| November of 2006 | 5.3479 | 5.3685 | 5.3495 | 5.2439 |
| December of 2006 | 5.3279 | 5.3601 | 5.3651 | 5.3139 |
| | **1-Month** | **3-Month** | **6-Month** | **12-Month** |
| January of 2007 | 5.3201 | 5.3601 | 5.4014 | 5.4414 |
| February of 2007 | 5.3214 | 5.3598 | 5.3723 | 5.3328 |
| March of 2007 | 5.3195 | 5.3479 | 5.3212 | 5.2009 |
| April of 2007 | 5.3201 | 5.3555 | 5.3581 | 5.2967 |

| | | | | |
|---|---|---|---|---|
| May of 2007 | 5.321 | 5.3595 | 5.3844 | 5.3885 |
| June of 2007 | 5.3195 | 5.3593 | 5.3817 | 5.4048 |
| July of 2007 | 5.32 | 5.3597 | 5.3743 | 5.3832 |
| August of 2007 | 5.4975 | 5.4837 | 5.3773 | 5.1860 |
| September of 2007 | 5.4927 | 5.4939 | 5.3538 | 5.0618 |
| October of 2007 | 4.9814 | 5.1465 | 5.0513 | 4.8771 |
| November of 2007 | 4.7672 | 4.9621 | 4.8324 | 4.5219 |
| December of 2007 | 5.0172 | 4.9794 | 4.825 | 4.4227 |
| | **1-Month** | **3-Month** | **6-Month** | **12-Month** |
| January of 2008 | 3.9091 | 3.9176 | 3.7795 | 3.4415 |
| February of 2008 | 3.1368 | 3.0876 | 3.0039 | 2.8046 |
| March of 2008 | 2.8066 | 2.7825 | 2.6798 | 2.5133 |
| April of 2008 | 2.7854 | 2.7947 | 2.8386 | 2.8288 |
| May of 2008 | 2.5065 | 2.6924 | 2.8544 | 3.0306 |
| June of 2008 | 2.4704 | 2.7654 | 3.1035 | 3.4176 |
| July of 2008 | 2.46 | 2.7921 | 3.1157 | 3.2796 |
| August of 2008 | 2.4682 | 2.8063 | 3.1116 | 3.2364 |
| September of 2008 | 2.927 | 3.1217 | 3.3369 | 3.3709 |
| October of 2008 | 3.8096 | 4.0586 | 3.8784 | 3.7893 |
| November of 2008 | 1.621 | 2.2791 | 2.6578 | 2.8231 |

| | 1-Month | 3-Month | 6-Month | 12-Month |
|---|---|---|---|---|
| December of 2008 | 1.0826 | 1.8294 | 2.1778 | 2.3845 |
| | **1-Month** | **3-Month** | **6-Month** | **12-Month** |
| January of 2009 | 0.3834 | 1.2108 | 1.6211 | 1.9024 |
| February of 2009 | 0.4628 | 1.2426 | 1.7569 | 2.0644 |
| March of 2009 | 0.5325 | 1.2667 | 1.8273 | 2.1173 |
| April of 2009 | 0.45 | 1.1062 | 1.6519 | 1.9351 |
| May of 2009 | 0.3423 | 0.8166 | 1.357 | 1.6791 |
| June of 2009 | 0.3162 | 0.6207 | 1.1796 | 1.6776 |
| July of 2009 | 0.2907 | 0.5153 | 0.9814 | 1.5 |
| August of 2009 | 0.2704 | 0.4245 | 0.8428 | 1.4231 |
| September of 2009 | 0.2473 | 0.298 | 0.6774 | 1.2691 |
| October of 2009 | 0.2443 | 0.2831 | 0.5897 | 1.2275 |
| November of 2009 | 0.2378 | 0.2681 | 0.5168 | 1.0844 |
| December of 2009 | 0.2329 | 0.2531 | 0.4529 | 0.9993 |
| | **1-Month** | **3-Month** | **6-Month** | **12-Month** |
| January of 2010 | 0.2317 | 0.2501 | 0.3993 | 0.8979 |
| February of 2010 | 0.2291 | 0.2505 | 0.3878 | 0.8516 |
| March of 2010 | 0.2373 | 0.2684 | 0.4106 | 0.8733 |
| April of 2010 | 0.2598 | 0.3116 | 0.4759 | 0.9598 |
| May of 2010 | 0.3355 | 0.4585 | 0.6593 | 1.13 |

| | | | | |
|---|---|---|---|---|
| June of 2010 | 0.3487 | 0.5369 | 0.7518 | 1.188 |
| July of 2010 | 0.3341 | 0.5103 | 0.7185 | 1.1178 |
| August of 2010 | 0.2755 | 0.3626 | 0.5791 | 0.9436 |
| September of 2010 | 0.257 | 0.2914 | 0.4778 | 0.8044 |
| October of 2010 | 0.2561 | 0.2888 | 0.455 | 0.7681 |
| November of 2010 | 0.2542 | 0.2869 | 0.4455 | 0.7644 |
| December of 2010 | 0.2618 | 0.3027 | 0.4584 | 0.7839 |
| | **1-Month** | **3-Month** | **6-Month** | **12-Month** |
| January of 2011 | 0.2606 | 0.3034 | 0.4554 | 0.7818 |
| February of 2011 | 0.2629 | 0.3119 | 0.4641 | 0.7934 |
| March of 2011 | 0.2533 | 0.3084 | 0.4608 | 0.7797 |
| April of 2011 | 0.2214 | 0.2814 | 0.4423 | 0.7701 |
| May of 2011 | 0.1978 | 0.2607 | 0.4141 | 0.7392 |
| June of 2011 | 0.1872 | 0.2478 | 0.3976 | 0.7269 |
| July of 2011 | 0.1866 | 0.2499 | 0.4139 | 0.7272 |
| August of 2011 | 0.2112 | 0.2932 | 0.4592 | 0.7767 |
| September of 2011 | 0.2309 | 0.3502 | 0.5222 | 0.8332 |
| October of 2011 | 0.2437 | 0.4065 | 0.5952 | 0.9086 |
| November of 2011 | 0.2537 | 0.4753 | 0.6805 | 1.0003 |
| December of 2011 | 0.2836 | 0.5557 | 0.7799 | 1.1003 |

|  | 1-Month | 3-Month | 6-Month | 12-Month |
|---|---|---|---|---|
| January of 2012 | 0.2829 | 0.5659 | 0.797 | 1.1146 |
| February of 2012 | 0.25 | 0.5032 | 0.7573 | 1.0712 |
| March of 2012 | 0.2406 | 0.4733 | 0.7413 | 1.0103 |
| April of 2012 | 0.2398 | 0.4668 | 0.7314 | 1.0486 |
| May of 2012 | 0.2389 | 0.4665 | 0.733 | 1.0615 |
|  | 1-Month | 3-Month | 6-Month | 12-Month |

**Estimate Your New Mortgage Payment - No SSN Required**



Limited-Time Offer! Transfer Your Balance 0% Intro APR for 18 months  Terms and Conditions  DISCOVER  Apply Now ▶

**Current LIBOR Rates  |  LIBOR Rates History  |  LIBOR Rates Chart  |  LIBOR News**

**Prime Rate  |  Current Prime Rate  |  Prime Rate History  |  Prime Rate Forecast  |  SITEMAP**

**Mortgage Refinance | Balance Transfer | Prepaid Debit Cards | Life Insurance | LIBOR**

**Student Credit Cards  |  Prepaid Debit Cards  |  Business Credit Cards  |  Secured Credit Cards**

**Chart: U.S. Prime Rate vs. Fed Funds Target Rate vs. 1-Month LIBOR vs. 3-Month LIBOR**

**Click Here to Jump to The Top of This Document**



**WSJ Discount Subscription | Barron's Subscription | MarketWatch | No Balance Transfer Fee**

**Discover Balance Transfer  |  Credit Cards | - How to Purchase a Foreclosure Property -**

Sources: The **WSJ** and The **BBA**

**Click Here to Return to the LIBOR Rates Homepage**

**Think You Pay Too Much for your Mortgage? Find Out!**

**More on LIBOR**

The London Interbank Offered Rates (LIBOR) can be described as the wholesale cost of money in the London interbank money market. Though the LIBOR rates are fixed in the United Kingdom, American consumers need to understand how LIBOR works, since LIBOR is used as an index in the pricing of many types of consumer loans in the United States.

**How LIBOR Works**

LIBOR is the average interest rate at which a select group of banks that participate in the London interbank money market can borrow unsecured funds from each other. There are many different LIBOR rates (maturities range from overnight to 12 months) for numerous currencies, including Eurodollars. A Eurodollar is an American dollar on deposit in any bank outside the United States, and is therefore not subject to regulation by the U.S. Federal Reserve.

LIBOR rates are fixed every UK business day by the international media company Thomson Reuters, in association with the British Bankers' Association (BBA), a not-for-profit trade association.

Just before 11:00 a.m. GMT, the BBA polls a specific panel of highly reputable, high-volume banks which participate in the London wholesale money market. The BBA finds out the rate at which each bank on the panel could borrow Eurodollars from other banks, for specific maturities. The BBA figures out the central tendency -- the interquartile mean -- for each maturity, then publishes these rates at about 11:30 a.m. GMT.

Three American banks are included in the panel surveyed by the BBA for Eurodollar fixing: Citibank, Bank of America and JP Morgan Chase. There are also 16 non-U.S. banks surveyed for Eurodollar fixing in London, bringing the total Eurodollar panel count to 19[1]. To get the interquartile mean for each maturity, the BBA starts with the 19 rates, discards the five lowest and five highest rates, then determines the average of the remaining 9 rates.

Back in the mid-1980's, the international banking system adopted LIBOR as a much needed benchmark for short-term, interbank loans. The LIBOR rates are now globally recognized indexes used for pricing many types of consumer and corporate loans, debt instruments and debt securities across the globe. For example, LIBOR is used as a benchmark for the vast majority of interest-only loans in The United States.

copyright © 2012 Steve "AmCy" Brown, www.FedPrimeRate.com

**Estimate Your New Mortgage Payment - No SSN Required**

**Click Here to Jump to The Top of This Document**

- Sitemap | Prime Rate | 0% Balance Transfer | 0% Credit Cards | Debt Help

- Car Insurance | P-2-P Lending | High-Yield Accounts

- Prime Mortgage Rate | Credit Card Balance Transfer Frequently Asked Questions (FAQ)



This website is not owned by or affiliated with The Wall Street Journal® or Dow Jones & Company. Information in this website is provided for educational purposes only. The owners of this website make no warranties with respect to any and all content contained within this website. Consult a financial professional before making important decisions related to any investment or loan product, including, but not limited to, business loans, personal loans, education loans, first or second mortgages, credit cards and car loans.
copyright © 2012 FedPrimeRate.com<sup>SM</sup>

# EXHIBIT 9

*SEC Info*   <u>Home</u>   <u>Search</u>   <u>My Interests</u>   <u>Help</u>   <u>Sign In</u>   *Please Sign In*

# Securitized Asset Backed Receivables LLC Trust 2007-BR4  ▦

*1 Closely Related:*   Securitized Asset Backed Receivables LLC - SEC # 1260840 - 6/1/12   ▾   [Go]

*Click on these tabs to view other information related to Securitized Asset Backed Receivables LLC Trust 2007-BR4.*

*View:*   <u>Registrant</u>   <u>About</u>   **Filings**   <u>Files</u>   <u>Relationships</u>   <u>Names</u>   <u>Topics</u>   <u>Web</u>   *<u>All</u>*

## 15 SEC Filings (from 6/12/07 to 3/28/08)

*Email:*   ☐ Send me <u>notifications of *all* future filings</u> involving **Securitized Asset Backed Receivables LLC Trust 2007-BR4**

*Most-Recent:*   <u>10-K — Annual Report — Form 10-K — for 12/31/07</u> — as Filer

[ List All Filings ]   ☑ as Filer   ☑ as "Owner"   ☑ as "Issuer"   ☐ as Filing Agent

[ Find ]   in  recent filings.   ▾   Show  Filings with "hits"  ▾  and  every "hit".   ▾
<u>Help...</u>   *Wildcards:*  ? (any letter).  ^ (many).  *Logic:*  for Docs:  & (and),  | (or);  for Text:  | (anywhere),  "(&)" (near).

## Documents & Exhibits (as Filer or "Owner")

| *Last Filing* | *Type* | | *Description* ▾ | *Documents* |
|---|---|---|---|---|
| 3/28/08 | <u>10-K</u> | Reports | <u>Annual Report — Form 10-K</u> — <u>XBRL Reports & Workbooks</u> | 1 |
| 7/6/07 | 8-K | Reports | <u>Current Reports — Form 8-K</u> | 2 |
| | | | · <u>Financial Statements and Exhibits</u> | |
| | | | · <u>Other Events</u> | |
| 1/17/08 | <u>15-15D</u> | Reports | <u>Notice of Suspension of Duty to File Reports — Form 15</u> | 1 |
| 1/8/08 | 10-D | Reports | <u>Periodic Distribution Reports by Asset-Backed Issuers — Form 10-D</u> | 7 |
| 6/14/07 | FWP | Registrations | <u>Free Writing Prospectuses — Rule 163/433</u> | 2 |
| 6/14/07 | 424B5 | Registrations | <u>Prospectus — Rule 424(b)(5)</u> | 1 |
| 3/28/08 | EX-34 | | <u>Attestation Reports on Assessments of Compliance with Servicing Criteria for Asset-Backed Securities</u> | 4 |
| 3/28/08 | <u>EX-31</u> | | <u>Certification per Sarbanes-Oxley Act (Section 302)</u> | 1 |
| 1/8/08 | GRAPHIC | | *<u>Images and Pictures</u>* | 280 |
| 7/6/07 | <u>EX-4</u> | | <u>Instrument Defining the Rights of Security Holders</u> | 1 |
| 1/8/08 | EX-99 | | <u>Miscellaneous Exhibits, including Press Releases</u> | 11 |
| 6/14/07 | <u>EX-5</u> | | <u>Opinion re: Legality</u> | 1 |
| 3/28/08 | EX-33 | | <u>Reports of Compliance with Servicing Criteria for Asset-Backed Securities</u> | 4 |
| 3/28/08 | <u>EX-35</u> | | <u>Servicer Compliance Statement for Asset-Backed Securities</u> | 1 |

| 7/6/07 | EX-1 | Underwriting Agreement | | 1 |

### Documents & Exhibits (as Subject Company or "Issuer")

| _Last Filing_ | _Type_ | | _Description_ | _Documents_ |
|---|---|---|---|---|
| 6/14/07 | FWP | Registrations | Free Writing Prospectuses — Rule 163/433 | 3 |

Sponsored Ads...

Copyright © 2012 *Fran Finnegan & Company*. All Rights Reserved.
*About* – *Privacy* – *Redactions* – *Help* — Sat, 30 Jun 23:58:23.3 GMT